# CAPLIN, TRUSTEE v. MARINE MIDLAND GRACE TRUST CO. OF NEW YORK

No. 70–220. Argued March 28, 1972—Decided May 22, 1972

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, J., filed a dissenting opinion, in which BRENNAN, WHITE, and BLACKMUN, JJ., joined, *post*, p. 435.

*Charles H. Miller* argued the cause for petitioner. With him on the briefs were *Mortimer M. Caplin, pro se, Henry Winestine,* and *Leon E. Irish.*

*John W. Dickey* argued the cause and filed a brief for respondent.

*David Ferber* argued the cause for the Securities and Exchange Commission urging reversal. With him on the briefs were *Solicitor General Griswold, Samuel Huntington, G. Bradford Cook,* and *Paul Gonson.*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

The sole issue in this case is whether petitioner, the trustee in reorganization of Webb & Knapp, Inc., has standing under Chapter X of the Bankruptcy Act, 52 Stat. 883, 11 U. S. C. § 501 *et seq.,* to assert, on behalf of persons holding debentures issued by Webb & Knapp, claims of misconduct by an indenture trustee. The United States District Court for the Southern District

of New York held that petitioner lacked the requisite standing, and the United States Court of Appeals for the Second Circuit affirmed *en banc,* with two judges dissenting, 439 F. 2d 118 (1971).[1] We granted certiorari, 404 U. S. 982 (1971), and we now affirm the decision of the Court of Appeals.

I

Webb & Knapp and its numerous subsidiaries were engaged in various real estate activities in both the United States and Canada. In 1954, the corporation executed an indenture with respondent, the Marine Midland Trust Company of New York (Marine), that provided for the issuance by Webb & Knapp of 5% debentures in the total amount of $8,607,600. A critical part of the indenture was the promise by Webb & Knapp that neither it nor any company affiliated with it [2] would incur or assume "any indebtedness resulting from money borrowed or from the purchase of real property or interests in real property . . . or purchase any real property or interests in real property" unless the company's consolidated tangible assets, as defined in the indenture, equaled 200% of certain liabilities, after giving effect to the contemplated indebtedness or purchase.[3]

---

[1] The District Court delivered three separate opinions in this case. They are unreported, but are included in the appendix prepared by the parties at 58a–70a. The Court of Appeals heard the case *en banc* after a panel of three judges determined that it was inclined to overrule the case on which the District Court had placed almost exclusive reliance. 439 F. 2d 118.

[2] Those companies in the affiliated group include any corporation that was entitled to be included in a consolidated tax return of Webb & Knapp. See 26 U. S. C. § 1502. Section 1.1 of the Indenture gave Webb & Knapp authority to consider other companies as affiliates if it chose to do so.

[3] Indenture of June 1, 1954, Webb & Knapp, Inc., to the Marine Midland Trust Company of New York § 3.6 (hereinafter referred to as Indenture).

By requiring the company to maintain an asset-liability ratio of 2:1, the indenture sought to protect debenture purchasers by providing a cushion against any losses that the company might suffer in the ordinary course of business. In order to demonstrate continuing compliance with the requirements of the indenture, Webb & Knapp covenanted to file an annual certificate with Marine stating whether the corporation (debtor) had defaulted on any of its responsibilities under the indenture during the preceding year.[4]

In its role as indenture trustee, Marine undertook "in case of default . . . to exercise such of the rights and powers vested in it by [the] Indenture, and to use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs." [5] This undertaking was qualified by language in the indenture that permitted the trustee to rely on the accuracy of certificates or reports of Webb & Knapp, in the absence of bad faith.[6]

Commencing in 1959, Webb & Knapp sustained substantial financial losses in every year.[7] Finally, on May 7, 1965, Marine filed a petition in district court seeking the involuntary reorganization of Webb & Knapp under Chapter X of the Bankruptcy Act, 11 U. S. C. § 501 et seq. Pursuant to § 208 of Chapter X, 11 U. S. C. § 608, the Securities and Exchange Commission inter-

---

[4] Indenture § 3.11.

[5] Indenture § 10.1 (a). This was also a statutory duty. See 15 U. S. C. § 77ooo.

[6] Indenture § 10.1 (d).

[7] Webb & Knapp showed a loss for tax purposes each year, although the company did show a gain on its books for 1961 attributable to a write-up of property owned by a wholly owned subsidiary of a company in which Webb & Knapp held 50% of the stock.

vened on May 10, 1965.[8] Marine's petition was subsequently approved and petitioner was appointed trustee in reorganization on May 18, 1965.

With the approval of the District Court, petitioner exercised the powers conferred upon him by 11 U. S. C. § 567 and undertook an extensive investigation of the financial affairs of Webb & Knapp. His investigation showed that the company had total assets of $21,538,621 and total liabilities of $60,036,164, plus contingent tax liabilities of $29,400,000. Included among the liabilities were the 1954 debentures in the principal amount of $4,298,200 plus interest subsequent to the inception of the reorganization proceeding.[9]

The investigation led petitioner to conclude that Marine had either willfully or negligently failed to fulfill its obligations under the indenture. Petitioner supported his conclusion with the following allegations: that from 1954 to 1964, Webb & Knapp's yearly certificates of compliance with the 2:1 asset-liability ratio mandated by the indenture were fraudulent, because they were based on grossly overvalued appraisals of real estate property; that from 1958 to 1964, Webb & Knapp did not have sufficient assets to comply with the terms of the indenture; that Marine should have known or did know of the inflated appraisals; and that because Marine permitted Webb & Knapp to violate the indenture by engaging in transactions that its impaired asset-liability

---

[8] The SEC has supported petitioner throughout this litigation. The agency is "an unnamed respondent before this Court." See *Protective Committee* v. *Anderson,* 390 U. S. 414, 420 n. 3 (1968). When referring to arguments made by petitioner, this opinion assumes, unless otherwise stated, that the SEC has made the same arguments.

[9] The difference between this amount and the amount of the debentures originally issued represents the amount of the principal that Webb & Knapp had repaid.

ratio forbade, Webb & Knapp suffered great financial losses.[10]

Having obtained the approval of the District Court, petitioner filed an independent action on behalf of the debenture holders against Marine seeking to recover the principal amount of the outstanding debentures as damages for Marine's alleged bad-faith failure to compel compliance with the terms of the indenture by Webb & Knapp. Petitioner also filed a counterclaim in the same amount against Marine in the reorganization proceeding in which Marine had previously filed a claim for services rendered. In the reorganization proceeding, petitioner also filed an objection to the claim for services rendered, on the ground that even if petitioner could not obtain an affirmative recovery against Marine on behalf of the bondholders, he could at least raise Marine's improper conduct as a reason why the claim for services rendered should be denied.[11] Finally, petitioner moved to compel an accounting by Marine.

Marine moved to dismiss the independent action and the counterclaim, moved to strike the objection to the claim for services rendered, and opposed the motion to compel an accounting. The District Court found that petitioner had no standing in his capacity as a trustee in reorganization under Chapter X of the Bankruptcy Act to raise claims of misconduct by an indenture trustee on behalf of debenture holders and granted both of Marine's motions to dismiss. Viewing the motion to compel an accounting as merely a third vehicle to raise the same

---

[10] These are merely allegations of petitioner, not findings of the lower courts. Because the District Court and the Court of Appeals held that petitioner had no standing, they had no occasion to consider the validity of the allegations.

[11] In its capacity as indenture trustee, Marine also filed a claim on behalf of all the debenture holders for the unpaid principal on the debentures.

claim on behalf of the debenture holders, the District Court denied that motion also. Only petitioner's objection to the claim for services rendered was left standing.[12] Petitioner appealed the dismissal of his claims and the denial of his motion for an accounting to the Court of Appeals. Marine filed a cross-appeal from the denial of its motion to strike petitioner's objection to the claim for services rendered. The Court of Appeals affirmed the decision of the District Court in its entirety.

## II

The issue confronting us has never before been presented to this Court. It is an issue that has only rarely been presented to other courts, and on those rare occasions, it has caused even the most able jurists to disagree. The first time the issue arose was in *Clarke* v. *Chase National Bank*, 137 F. 2d 797 (CA2 1943). Judge Augustus Hand wrote the opinion of the court holding that a trustee in reorganization did not have standing to sue a third party on behalf of bondholders. Judge Learned Hand disagreed and dissented. It is this decision that the lower courts found controlling in the instant case. The *Clarke* case is, in fact, the only other case in which the issue that is raised here was squarely presented.[13]

---

[12] This objection differs from the other claims in one respect: *i. e.*, it is an attempt to preserve the remaining assets of the debtor for all creditors other than Marine, whereas the other claims represent an attempt by the petitioner to increase the assets of the debtor for the benefit of a specific class of creditors, the debenture holders. Although Marine appealed the ruling of the District Court denying its motion to strike the objection, it did not seek review here of the decision of the Court of Appeals affirming the District Court on this issue. This issue is, therefore, not before us, and we offer no opinion on the propriety of the lower courts' ruling.

[13] Petitioner and the two dissenting judges in the Court of Appeals argue that the issue was presented in *Prudence-Bonds Corp.* v. *State Street Trust Co.*, 202 F. 2d 555 (CA2), cert. denied, 346 U. S. 835

The issue is a difficult one, and, as we point out later, it is one that is capable of resolution by explicit congressional action. Lacking a specific legislative statement on this issue, we must resolve it as best we can by examining the nature of Chapter X proceedings, the role of the trustee in reorganization, and the way in which standing to sue on behalf of debenture holders would affect or change that role.

Chapter X, enacted in 1938, stemmed from a comprehensive SEC study that disclosed widespread abuses under the then-existing provisions for business reorganizations. See Securities and Exchange Commission, Report on the Study and Investigation of the Work, Activities, Personnel and Functions of Protective and Reorganization Committees (1937–1940). This same study gave birth the following year to the Trust Indenture Act of 1939, 53 Stat. 1149, 15 U. S. C. § 77aaa *et seq.*, which is discussed *infra.*

In enacting Chapter X, Congress had protection of public investors primarily in mind. *SEC* v. *American Trailer Rentals Co.*, 379 U. S. 594 (1965). "The aims of Chapter X . . . were to afford greater protection to creditors and stockholders by providing greater judicial control over the entire proceedings and impartial and expert administrative assistance in corporate reorganizations through appointment of a disinterested trustee and the active participation of the SEC." *Id.*, at 604. In

(1953), and that the decision of the court in that case by Judge Learned Hand overruled *Clarke* v. *Chase National Bank*, 137 F. 2d 797 (CA2 1943), *sub silentio.* They also argue that the issue was presented and decided contrary to *Clarke* in *In re Solar Manufacturing Corp.*, 200 F. 2d 327 (CA3 1952), cert. denied *sub nom. Marine Midland Trust Co.* v. *McGirl*, 345 U. S. 940 (1953). But, the majority of the Court of Appeals found these cases to be distinguishable, and Marine urges that the majority was correct. We do not intend to become enmeshed in this controversy and merely indicate its existence.

contradistinction to a bankruptcy proceeding where liquidation of a corporation and distribution of its assets is the goal, a Chapter X proceeding is for purposes of rehabilitating the corporation and reorganizing it. *Ibid.* Chapter X proceedings are not limited to insolvent corporations but are open to those corporations that are solvent in the bankruptcy (asset-liability) sense but are unable to meet their obligations as they mature. *United States* v. *Key,* 397 U. S. 322, 329 (1970); 11 U. S. C. § 530 (1).

The trustee in reorganization is the center of the statutory scheme. H. R. Rep. No. 1409, 75th Cong., 1st Sess., 43, 44. Title 11 U. S. C. § 567 gives the trustee broad powers:

"The trustee upon his appointment and qualification—

"(1) shall, if the judge shall so direct, forthwith investigate the acts, conduct, property, liabilities, and financial condition of the debtor, the operation of its business and the desirability of the continuance thereof, and any other matter relevant to the proceeding or to the formulation of a plan, and report thereon to the judge;

"(2) may, if the judge shall so direct, examine the directors and officers of the debtor and any other witnesses concerning the foregoing matters or any of them;

"(3) shall report to the judge any facts ascertained by him pertaining to fraud, misconduct, mismanagement and irregularities, and to any causes of action available to the estate;

. . . . .

"(5) shall, at the earliest date practicable, prepare and submit a brief statement of his investigation of the property, liabilities, and financial condition of the debtor, the operation of its business and

the desirability of the continuance thereof, in such form and manner as the judge may direct, to the creditors, stockholders, indenture trustees, the Securities and Exchange Commission, and such other persons as the judge may designate; and

"(6) shall give notice to the creditors and stockholders that they may submit to him suggestions for the formulation of a plan, or proposals in the form of plans, within a time therein named."

Title 11 U. S. C. § 587 expands these powers:

"Where not inconsistent with the provisions of this chapter, a trustee, upon his appointment and qualification, shall be vested with the same rights, be subject to the same duties, and exercise the same powers as a trustee appointed under section 72 of this title, and, if authorized by the judge, shall have and may exercise such additional rights and powers as a receiver in equity would have if appointed by a court of the United States for the property of the debtor."

The powers given a trustee appointed under § 72 are set forth in a footnote.[14]

---

[14] Title 11 U. S. C. § 110 gives the trustee title to the following "property":

"(a) The trustee of the estate of a bankrupt and his successor or successors, if any, upon his or their appointment and qualification, shall in turn be vested by operation of law with the title of the bankrupt as of the date of the filing of the petition initiating a proceeding under this title . . . to all of the following kinds of property wherever located (1) documents relating to his property; (2) interests in patents, patent rights, copyrights, and trade-marks, and in applications therefor . . . (3) powers which he might have exercised for his own benefit, but not those which he might have exercised solely for some other person; (4) property transferred by him in fraud of his creditors; (5) property, including rights of action, which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and

Petitioner argues that these powers are broad enough to encompass a suit on behalf of debenture holders against an indenture trustee who has acted in bad faith, and who has, therefore, violated the indenture and the Trust Indenture Act of 1939, 15 U. S. C. § 77aaa *et seq.*

As pointed out above, the Trust Indenture Act was passed one year after Chapter X was enacted. Prior to its enactment, indenture trustees immunized themselves from any liability for either deliberate or negligent misconduct by writing exculpatory provisions into the indenture. Even in cases where misconduct by the indenture trustee was the proximate cause of injury to debenture holders, they found themselves impotent under the terms of most indentures to take action against the trustee. See generally 2 L. Loss, Securities Regulation 719–725 (2d ed. 1961). This problem and others are specifically mentioned in 15 U. S. C. § 77bbb as establishing a necessity for regulation.

The regulation provided by the Act takes many forms. 15 U. S. C. § 77eee requires that whenever securities covered by the Trust Indenture Act are also covered by the registration provisions of the Securities Act of 1933, 48 Stat. 74, 15 U. S. C. § 77a *et seq.*, certain information about the indenture trustee and the terms of the in-

---

sold under judicial process against him, or otherwise seized, impounded, or sequestered . . . (6) rights of action arising upon contracts, or usury, or the unlawful taking or detention of or injury to his property; (7) contingent remainders, executory devises and limitations, rights of entry for condition broken, rights or possibilities of reverter, and like interests in real property, which were nonassignable prior to bankruptcy and which, within six months thereafter, become assignable interests or estates or give rise to powers in the bankrupt to acquire assignable interests or estates; and (8) property held by an assignee for the benefit of creditors appointed under an assignment which constituted an act of bankruptcy, which property shall, for the purposes of this title, be deemed to be held by the assignee as the agent of the bankrupt and shall be subject to the summary jurisdiction of the court."

denture must be included in the registration statement. Title 15 U. S. C. § 77ggg provides that when securities are not registered under the 1933 Act but are covered by the Trust Indenture Act, the indenture must be "qualified" by the SEC before it is legal to sell the securities. Standards for eligibility and disqualification of a trustee are established by 15 U. S. C. § 77jjj, and the duties and responsibilities of a trustee are enumerated in 15 U. S. C. § 77ooo.[15]

The indenture giving rise to this litigation was qualified by the SEC pursuant to the Trust Indenture Act of 1939. By alleging that the indenture trustee negligently or intentionally failed to prevent Webb & Knapp from violating the terms of the indenture, petitioner clearly alleges a violation of the 1939 legislation, 15 U. S. C. § 77ooo.[16] But the question remains whether petitioner is a proper party to take corrective action.[17]

---

[15] The SEC is given general supervisory powers over indentures in various sections of the Trust Indenture Act. See, e. g., 15 U. S. C. §§ 77ddd (c), (d), (e); 77eee (a), (c); 77ggg; 77sss; 77ttt; 77uuu. In addition, 15 U. S. C. § 77hhh provides that the SEC may order consolidation of reports or certificates filed under the Trust Indenture Act with information or documents filed under the Securities Act of 1933, 48 Stat. 74, 15 U. S. C. § 77a et seq., and the Securities Exchange Act of 1934, 48 Stat. 881, 15 U. S. C. § 78a et seq., the Public Utility Holding Company Act of 1935, 49 Stat. 838, 15 U. S. C. § 79 et seq.

[16] The provisions of the indenture discussed previously comply with the requirements of 15 U. S. C. § 77ooo. While the indenture trustee is not permitted by the statute to exculpate himself from liability for noncompliance with the indenture, the indenture trustee may rely in good faith on certificates or reports filed pursuant to the indenture and in compliance with the provisions thereof.

[17] We assume, arguendo, that violation of 15 U. S. C. § 77ooo would give rise to a cause of action against an indenture trustee by debenture holders. If there is a cause of action, 15 U. S. C. § 77vvv would seem to give federal courts jurisdiction. The Court of Appeals inferred that such suits would be proper, 439 F. 2d, at 123 n. 5, but did not decide the point. Since we conclude that even

Petitioner urges that the reorganization trustee is in a far better position than debt investors to discover and to prosecute claims based on the alleged failure of an indenture trustee to live up to the provisions of the indenture. He points to 11 U. S. C. § 567, set forth *supra,* and emphasizes that not only does the reorganization trustee have possession of the records of the debtor, but he also has a statutory duty to investigate the debtor's affairs and to "report to the judge any facts ascertained by him pertaining to fraud, misconduct, mismanagement and irregularities, and to any causes of action available to the estate." Reference is made, too, to 15 U. S. C. § 77bbb (a)(1), which states that one of the problems Congress saw with respect to misconduct by indenture trustees was that "(A) individual action by . . . investors for the purpose of protecting and enforcing their rights is rendered impracticable by reason of the disproportionate expense of taking such action, and (B) concerted action by such investors in their common interest through representatives of their own selection is impeded by reason of the wide dispersion of such investors through many States, and by reason of the fact that information as to the names and addresses of such investors generally is not available to such investors." [18]

if such suits may be brought, petitioner lacks standing to bring them, we do not decide the question.

[18] It should be noted that the Trust Indenture Act of 1939 was enacted on August 3, 1939. The Federal Rules of Civil Procedure were not even one year old. They were adopted by this Court on December 20, 1937, and they became effective on September 16, 1938, 308 U. S. 647. The class action was a comparatively recent phenomenon with respect to damage actions and it was not tremendously helpful in the early days. See, *e. g.,* Moore, Federal Rules of Civil Procedure: Some Problems Raised by the Preliminary Draft, 25 Geo. L. J. 551, 570–576 (1937); Kalven & Rosenfield, The Contemporary Function of the Class Suit, 8 U. Chi. L. Rev. 684 (1941). It could not be said that the class action was an efficacious remedy in 1939.

Finally, petitioner asserts that to give him standing to sue on behalf of debenture holders will not encourage vexatious litigation or unduly deplete the resources of the debtor that he has been appointed to reorganize. He supports the first half of this proposition by noting that any action he takes is subject to the supervision of the District Court and to intervention by the SEC. The second half of the proposition finds support in the argument discussed above that petitioner already has a duty of investigation and that the minimal additional burden of prosecuting a lawsuit will not be great.

At first blush, petitioner's theory, adopted in the opinion of the dissenters in the Court of Appeals, seems reasonable. But, there are three problems with petitioner's argument and these problems require that his position be rejected.

First, Congress has established an elaborate system of controls with respect to indenture trustees and reorganization proceedings, and nowhere in the statutory scheme is there any suggestion that the trustee in reorganization is to assume the responsibility of suing third parties on behalf of debenture holders. The language, in fact, indicates that Congress had no such intent in mind. The statute, 11 U. S. C. § 567 (3), gives the trustee the right, and indeed imposes the duty, to investigate fraud and misconduct and to report to the judge the potential causes of action "available to the estate." Even assuming that this section is read as if the quoted words were not present, and that it authorizes a trustee in reorganization to report whether he believes an indenture trustee has violated a duty to third-party debenture holders, there is nothing in the section that enables him to collect money not owed to the estate. Nor is there anything in 11 U. S. C. § 110, set forth in relevant part in footnote 14, *supra,* that gives him this authority. His task is simply to "collect and reduce to

money the property of the estates for which [he is trustee]." 11 U. S. C. § 75.

The only support petitioner finds in the relevant statutes is in that portion of 11 U. S. C. § 587 which gives reorganization trustees the additional rights that a "receiver in equity would have if appointed by a court of the United States for the property of the debtor." Petitioner relies on *McCandless* v. *Furlaud,* 296 U. S. 140 (1935), to support the proposition that a receiver in equity may sue third parties on behalf of bondholders. But, the opinion of the Court by Mr. Justice Cardozo clearly emphasizes that the receiver in that case was suing on behalf of the corporation, not third parties; he was simply stating the same claim that the corporation could have made had it brought suit prior to entering receivership.[19] The debtor corporation makes no such claim in this case. See generally 2 R. Clark, Law and Practice of Receivers § 362, at 619 (3d ed. 1959).

This brings us to the second problem with petitioner's argument. Nowhere does petitioner argue that Webb & Knapp could make any claim against Marine. Indeed, the conspicuous silence on this point is a tacit admission that no such claim could be made.[20] Assuming that

---

[19] This point is especially clear in light of the fact that the Court split 5–4 on whether *Old Dominion Copper Co.* v. *Lewisohn,* 210 U. S. 206 (1908) (Holmes, J.), was binding in *McCandless* v. *Furlaud.* The issue in the controversial *Old Dominion* case was whether *a corporation* - had a cause of action against promoter-director-stockholders.

[20] If petitioner could sue on behalf of Webb & Knapp, the statute that requires that he report possible causes of action to the court would require mention of this cause of action. Moreover, petitioner has brought every conceivable claim that is available to him as trustee. Not only has he brought this action against the indenture trustee, but he has also sued former officers of Webb & Knapp charging them with waste. Brief for SEC 5–6. Certain settlements have apparently been made in some of these other actions. Brief for Respondent 45 n. 18.

petitioner's allegations of misconduct on the part of the indenture trustee are true, petitioner has at most described a situation where Webb & Knapp and Marine were *in pari delicto*. Whatever damage the debenture holders suffered, under petitioner's theory Webb & Knapp is as much at fault as Marine, if not more so. A question would arise, therefore, whether Marine would be entitled to be subrogated to the claims of the debenture holders. The Court of Appeals thought that subrogation would be required, 439 F. 2d, at 122.

If the Court of Appeals is correct, it is then difficult to see what advantage there is in giving petitioner standing to sue, for as Chief Judge Friendly noted in his opinion for the court below:

> "It is necessary in the first instance to consider what effect a recovery by the Chapter X Trustee would have on the reorganization. On a superficial view this might seem substantial—if, for example, the Chapter X Trustee were to achieve a complete recovery, the debenture holders would be paid off and it might seem there would be that much more for the other creditors and the stockholders. But this pleasant prospect speedily evaporates when the law of subrogation is brought into play. As a result of subrogation, Marine would simply be substituted for the debenture holders as the claimant. Cf. ALI, Restatement of Security § 141 (1941). If the Chapter X Trustee recovered judgment in a lesser amount, the claim of the debenture holders would still be provable in full, with the division of the proceeds between them and Marine dependent upon the results of the reorganization, and other creditors or stockholders would not be affected." 439 F. 2d, at 122.

Even if the Court of Appeals is incorrect in its view of the propriety of subrogation under the facts of this case,

the fact remains that in every reorganization there is going to be a question of how much the trustee in reorganization should be permitted to recover on behalf of the debenture holders. The answer is, of course, whatever he cannot recoup from the corporation. Once this is recognized, the wisdom of Judge Augustus Hand in *Clarke* v. *Chase National Bank,* 137 F. 2d, at 800, becomes readily apparent:

> "Each creditor, including the debenture-holders, can prove the full amount of his claim, and only to the extent that a debenture-holder fails to satisfy it from the bankruptcy estate will he suffer a loss which he can assert against the defendant through its failure to enforce the negative covenants."

In other words, debenture holders will not be able to recover damages from the indenture trustee until the reorganization is far enough along so that a reasonable approximation can be made as to the extent of their losses, if any. It is difficult to see precisely why it is at that point that the trustee in reorganization should represent the interests of the debenture holders, who are capable of deciding for themselves whether or not it is worthwhile to seek to recoup whatever losses they may have suffered by an action against the indenture trustee. Petitioner appears to concede that any suit by debenture holders would not affect the interests of other parties to the reorganization, assuming that the Court of Appeals is correct on the subrogation point. It would seem, therefore, that the debenture holders, the persons truly affected by the suit against Marine, should make their own assessment of the respective advantages and disadvantages, not only of litigation, but of various theories of litigation.

This brings us to the third problem with petitioner's argument: *i. e.,* a suit by him on behalf of debenture holders may be inconsistent with any independent actions

that they might bring themselves. Petitioner and the SEC make very plain their position that a suit by the trustee in reorganization does not pre-empt suits by individual debenture holders. They maintain, however, that it would be unlikely that such suits would be brought since the debenture holders could reasonably expect that the trustee would vigorously prosecute the claims of all debt investors. But, independent actions are still likely because it is extremely doubtful that the trustee and all debenture holders would agree on the amount of damages to seek, or even on the theory on which to sue.[21] Moreover, if the indenture trustee wins the suit brought by the trustee in reorganization, unless the debenture holders are bound by that victory, the proliferation of litigation that petitioner seeks to avoid would then ensue. Finally, a question would arise as to who was bound by any settlement.[22]

---

[21] Three private actions have been brought by debenture holders against Marine, one in federal court and two in state court. See Brief for Petitioner 21 n. 9. These suits make the same claims made by the petitioner in the instant case, as well as others which he has not made, including alleged violations of the securities laws.

The trustee may well have interests that differ from those of the bondholders. For example, petitioner has sued not only Marine, but also the former officers of Webb & Knapp. See n. 20, *supra*. In settling the suits brought against the officers, petitioner may well take positions that conflict with those he would take in a suit against Marine. The conflict may at times be unfavorable to the debenture holders. One answer obviously is that the District Court and the SEC can take action to prevent any such conflict from developing, *e. g.*, by denying the trustee in reorganization the right to sue on behalf of debenture holders in selected cases. The problem with this answer is that the conflict may not appear until the suit is well under way. In such a case the debenture holders might regret placing their confidence in the trustee.

[22] Chapter X, 11 U. S. C. § 616 (2), provides that a plan for reorganization "may deal with all or any part of the property of the debtor." It also provides that the plan "may include provisions for the settlement or adjustment of claims belonging to the debtor

Rule 23 of the Federal Rules of Civil Procedure, which provides for class actions, avoids some of these difficulties. It is surely a powerful remedy and one that is available to all debenture holders.[23] Some of the factors that formerly deterred such actions have been changed by the Trust Indenture Act of 1939. Title 15 U. S. C. § 77*lll*, for example, now requires that the debtor corporation maintain lists of debenture holders that it must turn over to the indenture trustees at regular intervals. Such lists are available to the individual de-

---

or to the estate." 11 U. S. C. § 616 (13). Despite these provisions, petitioner urges, in effect, that he can settle a suit on behalf of bondholders without binding them to the settlement. Reply Brief for Petitioner 7–8. But, as pointed out in the text, *supra,* petitioner only has authority to pursue claims belonging to the estate. Petitioner is thus caught on the horns of a dilemma: either he is incorrect in asserting that the statutory definition of duties should be read so broadly as to allow a trustee in reorganization to treat claims by debenture holders against third parties as sufficiently related to the estate that the trustee may sue on behalf of the debenture holders; or he is correct, and § 616 would appear to permit him to bind the debenture holders to a settlement. Even if petitioner can have it both ways, his inability to bind the persons on whose behalf he sues undercuts the utility of his suing. Because the debenture holders could bring a class action and bind all members of the class, they can make a binding settlement and avoid lengthy and expensive litigation. Petitioner cannot make such a settlement. Moreover, if a reorganization trustee does settle a suit that he has brought on behalf of debenture holders, he may find that rather than serving as their representative, he is forced to oppose their interests when they bring independent actions to recover more than the settlement figure. In this event, the reorganization trustee would be forced to justify his settlement, and he would theoretically join the indenture trustee in opposing the action of the debenture holders. He would find himself on both sides of the same transaction.

[23] Again we assume, *arguendo,* that the Trust Indenture Act gives a right of action to debenture holders under these circumstances. Obviously, if the debenture holders themselves have no cause of action, their surrogate is in no better position.

benture holders upon request. Debenture holders would also be able to take advantage of any information obtained by the trustee in reorganization as a result of the investigation which the statute requires that he make. In addition, petitioner himself maintains that counsel fees would be recoverable if the action was successful. Brief for Petitioner 20; cf. 15 U. S. C. § 77nnn.

Thus, there is no showing whatever that by giving petitioner standing to sue on behalf of the debenture holders we would reduce litigation. On the contrary, there is every indication that litigation would be increased, or at least complicated.

## III

For the reasons discussed above we conclude that petitioner does not have standing to sue an indenture trustee on behalf of debenture holders. This does not mean that it would be unwise to confer such standing on trustees in reorganization. It simply signifies that Congress has not yet indicated even a scintilla of an intention to do so, and that such a policy decision must be left to Congress and not to the judiciary.

Congress might well decide that reorganizations have not fared badly in the 34 years since Chapter X was enacted and that the *status quo* is preferable to inviting new problems by making changes in the system. Or, Congress could determine that the trustee in a reorganization was so well situated for bringing suits against indenture trustees that he should be permitted to do so. In this event, Congress might also determine that the trustee's action was exclusive, or that it should be brought as a class action on behalf of all debenture holders, or perhaps even that the debenture holders should have the option of suing on their own or having the trustee sue on their behalf. Any number of alternatives are available. Congress would also be able to answer questions regarding subrogation or timing of law suits before these ques-

tions arise in the context of litigation. Whatever the decision, it is one that only Congress can make.

Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN, MR. JUSTICE WHITE, and MR. JUSTICE BLACKMUN concur, dissenting.

With all respect, today's decision reflects a misunderstanding of the important role which a reorganization trustee under Chapter X of the Bankruptcy Act, 11 U. S. C. § 567, is supposed to perform. Though prior to Chapter X the debtor had usually remained in possession, Chapter X effected a basic change by putting a disinterested trustee in charge. H. R. Rep. No. 1409, 75th Cong., 1st Sess., 43–44. Working under the direction of the Court, the reorganization trustee was to make the necessary investigations concerning the debtor, the operation of its business, and the desirability of its continuance "and any other matter relevant to the proceeding or *to the formulation of a plan,* and report thereon to the judge." 11 U. S. C. § 567 (emphasis added). The reorganization trustee is, indeed, charged by 11 U. S. C. § 569 with the responsibility of formulating a plan.[1]

A Chapter X plan does not look forward to a discharge of the debtor as does ordinary bankruptcy, but rather to an overhaul of its capital structure, a simplification of it, if need be, and the determination of the

[1] 11 U. S. C. § 569 provides:

"Where a trustee has been appointed the judge shall fix a time within which the trustee shall prepare and file a plan, or a report of his reasons why a plan cannot be effected, and shall fix a subsequent time for a hearing on such plan or report and for the consideration of any objections which may be made or of such amendments or plans as may be proposed by the debtor or by any creditor or stockholder."

fair share which each class of old creditors shall receive and what participation, if any, the old stockholders may be granted. The test which the court must ultimately apply under Chapter X is whether a plan is "fair and equitable, and feasible." 11 U. S. C. § 574. The test of "fair and equitable" derives from the old equity receiverships and was adopted in former § 77B of the Bankruptcy Act and under Chapter X.[2] As stated in the

---

[2] The "fixed principle" that senior interests must be made whole before junior interests may participate in a reorganization has its roots in *Northern Pacific R. Co. v. Boyd,* 228 U. S. 482. In that case Boyd was a general and unpaid creditor of the old corporation. In a reorganization Boyd was not fully compensated although the old stockholders were allowed to participate in the new company. He proceeded against the assets of the new venture on the ground that since the old stockholders continued in the business the latter had received property which belonged to the creditors. This Court ruled for Boyd and said "if purposely or unintentionally a single creditor was not paid, or provided for in the reorganization, he could assert his superior rights against the subordinate interests of the old stockholders in the property transferred to the new company." *Id.,* at 504. This principle came to be known as the "absolute priority rule." See Bonbright & Bergerman, Two Rival Theories of Priority Rights of Security Holders in a Corporate Reorganization, 28 Col. L. Rev. 127 (1928). The rule was incorporated into equity receiverships. *Kansas City Southern R. Co. v. Guardian Trust Co.,* 240 U. S. 166; *Kansas City Terminal R. Co. v. Central Union Trust Co.,* 271 U. S. 445. Later, in *Case v. Los Angeles Lumber Co.,* 308 U. S. 106, 116, we held that the absolute-priority rule was part of the gloss which the case law had placed upon the phrase "fair and equitable," language which had been used in § 77B (f)(1) of the newly enacted § 77B bankruptcy reorganization statute. 48 Stat. 919. We concluded that Congress had intended that the *Boyd* rule be carried forward. *Consolidated Rock Co. v. Du Bois,* 312 U. S. 510, 527, reaffirmed this holding and further held that the requirement of absolute priority extended to cases where the debtor was solvent as well as those where the debtor was insolvent. Later, we made clear that the *Boyd* requirement obtained under Chapter X. *Marine Harbor Properties, Inc. v. Manufacturers Trust Co.,* 317 U. S. 78, 85–87. As recent cases reflect, the absolute-priority doc-

House Report "the [reorganization] trustee is required to assemble the salient facts necessary for a determination of the fairness and equity of a plan of reorganization." H. R. Rep. No. 1409, 75th Cong., 1st Sess., 43.

The requirements of "fair and equitable," which the court must apply, entail the application of the absolute priority rule which we discussed at length in *Case* v. *Los Angeles Lumber Co.*, 308 U. S. 106, and which was followed in *Consolidated Rock Co.* v. *Du Bois*, 312 U. S. 510. It not only gives creditors full priority over stockholders, but protects senior classes of creditors against the claim that "junior interests were improperly permitted to participate in a plan or were too liberally treated therein." 308 U. S., at 118. Unsecured creditors need not be paid in cash as a condition of stockholders retaining an interest in the reorganized company, for they may be protected by the issuance " 'on equitable terms, of income bonds or preferred stock.' " *Id.*, at 117.

---

trine has been continued and is firmly entrenched in Chapter X law. *E. g., Protective Committee* v. *Anderson*, 390 U. S. 414, 441; *United States* v. *Key*, 397 U. S. 322, 327 (see also concurring opinion, at 333). The reach of that doctrine, however, has not been restricted to Chapter X proceedings but has also been applied to railroad reorganizations under § 77 of the Bankruptcy Act, *Ecker* v. *Western Pacific R. Co.*, 318 U. S. 448, 484; *Group of Investors* v. *Milwaukee R. Co.*, 318 U. S. 523, 535, 571; *Reconstruction Finance Corp.* v. *Denver & R. G. W. R. Co.*, 328 U. S. 495; to dissolutions under the Public Utility Holding Company Act of 1935, 49 Stat. 838, *Otis & Co.* v. *SEC*, 323 U. S. 624, 634 (but see dissenting opinion concluding that the rule had not been faithfully followed, at 648–649); *SEC* v. *Central-Illinois Corp.*, 338 U. S. 96, 130; to Chapter IX bankruptcy proceedings, *Kelley* v. *Everglades District*, 319 U. S. 415, 420–421, n. 1; and to affirm a dismissal of a Chapter XI petition on the ground that a Chapter X reorganization would provide more protection for creditors than a Chapter XI arrangement, *SEC* v. *U. S. Realty Co.*, 310 U. S. 434, 452, 456–458. And see *General Stores Corp.* v. *Shlensky*, 350 U. S. 462, 466.

And, as we said in the *Du Bois* case:

> "If the creditors are adequately compensated for the loss of their prior claims, it is not material out of what assets they are paid. So long as they receive full compensatory treatment and so long as each group shares in the securities of the whole enterprise on an equitable basis, the requirements of 'fair and equitable' are satisfied." 312 U. S., at 530.

The face amount of the debentures in litigation here was $4,298,200. The damages sought against the indenture trustee are in the same amount. If we assume, *arguendo*, that there is merit in the cause of action and that the indenture trustee is fully responsible, one entire class of security holders is eliminated from any necessary consideration in the plan. Or if there is only partial recovery, there is a pro rata change in the relative positions of the various classes of creditors. A plan cannot be designed without a final determination of the status of the debenture holders *vis-à-vis* the indenture trustee, or at least an informed judgment concerning the value of that claim.

It is said that the assets of the debtor were some $21 million and the liabilities some $60 million. Whether conditions have changed so as to leave some equity for the old stockholders, we do not know. The rule announced by the Court today, however, is not for this case alone but is applicable to all reorganizations under Chapter X. In some cases the elimination of one entire class of creditors or a pro rata reduction in their claims would give stockholders a chance to participate in the plan. There is no opportunity to make that determination without investigation, without a pursuit of claims, and without their prosecution or settlement. The reorganization trustee has full authority to do just that under the direction of the court. And unless he can take those

steps, he will not be able to formulate a plan of reorganization for submission to the court.

Of course, debenture holders or a protective committee representing them may in some cases take the lead. But Chapter X was written with the view that such matters should not be left to happenstance. That is why the reorganization trustee was made the "focal point" for taking an inventory of assets available to the several claimants and providing what plan would be fair and equitable in light of the security of some claimants or the payment of claims rightfully due them.[3]

There is, with all respect, no merit in the argument that, if the reorganization trustee recovers against the indenture trustee on behalf of the debenture holders, the indenture trustee will be subrogated to the debenture holders, leaving the total claims affected by the plan wholly unchanged.

The complaint against the indenture trustee charges willful misconduct or gross negligence. What the merits may be we, of course, do not know and intimate no opinion. But, if true, the Trust Indenture Act of 1939, 15 U. S. C. § 77*ooo,* gives no immunity.[4]

We said in *Pepper* v. *Litton,* 308 U. S. 295, 307, that "the bankruptcy court in passing on allowance of claims sits as a court of equity" and we cited the cases showing that claimants in a fiduciary position may have their claims either wholly disallowed or subordinated. *Id.,* at 311, 312. As stated in *American Surety Co.* v. *Bethle-*

---

[3] See Hearings on H. R. 8406 before a Subcommittee of the Senate Committee on the Judiciary, 75th Cong., 2d Sess., 126.

[4] While the indenture trustee may rely on certificates or opinions concerning the truth of statements and the correctness of opinions "in the absence of bad faith" (15 U. S. C. § 77*ooo* (a)(1)), it is not exempt from liability "for its own negligent action, its own negligent failure to act, or its own willful misconduct" (15 U. S. C. § 77*ooo* (d)), save for errors in judgment made in good faith. *Ibid.*

*hem Bank,* 314 U. S. 314, 317, while the surety is "a special kind of secured creditor" it has a right that "can be availed of only by a surety alert in discharging its duty . . . and one not guilty of inequitable conduct." The indenture trustee is not, of course, a surety. It would have to seek subrogation under the general equitable doctrine, stated as follows by the American Law Institute: [5]

> "Where property of one person is used in discharging an obligation owed by another or a lien upon the property of another, under such circumstances that the other would be unjustly enriched by the retention of the benefit thus conferred, the former is entitled to be subrogated to the position of the obligee or lien-holder."

It is not imaginable that any court would ever hold that an indenture trustee, found culpably responsible for the default on debentures, would be subrogated with respect to funds which otherwise would go to innocent creditors or stockholders on the ground that paying money to them rather than to it would constitute unjust enrichment. A person "who invokes the doctrine of subrogation must come into court with clean hands." *German Bank* v. *United States,* 148 U. S. 573, 581.

I agree with Judge Kaufman and Judge Hays, dissenting below, and would reverse this judgment.

---

[5] Restatement of Restitution § 162 (1937).