In re B.J. McADAMS, INC.; Debtor.

CONSTELLATION DEVELOPMENT
CORPORATION; Appellant;

v.

James F. DOWDEN, Successor Trustee;
United States, ex rel. Internal
Revenue Service; Appellees.

No. 94–3658.

United States Court of Appeals,
Eighth Circuit.

Submitted June 14, 1995.

Decided Sept. 20, 1995.

Rehearing and Suggestion for Rehearing
En Banc Denied Nov. 28, 1995.

Raymond C. Smith, Fayetteville, AR, argued (Thomas J. Pendowski, North Little Rock, AR, on the brief), for appellant Constellation Development.

Robert R. Ross, Little Rock, AR, argued, for appellee James Dowden.

Curtis C. Pett, Dept. of Justice, Washington, DC, argued, for U.S.

Before MORRIS SHEPPARD ARNOLD, Circuit Judge; and HEANEY and JOHN R. GIBSON, Senior Circuit Judges.

HEANEY, Senior Circuit Judge.

This case appears in our court a second time. In *In re B.J. McAdams, Inc.*, 999 F.2d 1221 (8th Cir.1993), we reversed on procedural grounds the district court's dismissal of an appeal by Constellation Development Corporation as untimely filed. On remand, the bankruptcy court held that Constellation's asserted lien against B.J. McAdams, Inc. was null and void. The present appeal presents two issues. First, we must determine whether the trustee in bankruptcy had standing to bring the action below. Second, we review the bankruptcy court's holding that Constellation and several related corporations were the "alter egos" or mere instrumentalities of the debtor, B.J. McAdams, Inc. We affirm on both counts.

I.

This action arises from the involuntary bankruptcy of B.J. McAdams, Inc. ("BJMI"), an insolvent Arkansas trucking enterprise and one of an array of corporate entities created and controlled by Bobby Joe McAdams ("McAdams"). McAdams was the president, chief executive officer, and sole stockholder of BJMI. His son, Robert L. McAdams ("Robert"), held the title of executive vice-president of BJMI. The report of a psychological examiner indicates that Robert "functions in the borderline range of intelligence, likely has difficulty understanding social expectations, may be easily confused, has poor judgment or common sense and likely has minimal capacity for learning any kind of

complex task." McAdams stated that Robert was "not capable of taking care of his financial affairs." McAdams and Robert both testified that Robert made neither business nor personal decisions without the advice and assistance of his father, and that he almost always followed his father's instructions.

Beginning in the late 1980s, McAdams formed various corporations in an attempt to reduce BJMI's operating costs. Together, the entities comprised an interlocking web of contracts, agreements, promissory notes, and transfers of funds. Three of these corporations merit close examination.

### A.

Parthenon Insurance Company was formed in 1986 under the laws of the British Virgin Islands. Robert has been at various times director, corporate treasurer, and president/secretary of Parthenon. From 1986 to 1988, Parthenon's stock was held by McAdams and Robert. In 1988, Robert owned half and Constellation owned the other half. Because Parthenon owned one hundred percent of Constellation, Robert was effectively the sole owner of both corporations in 1988 and 1989. In March, 1989, Parthenon was purportedly sold in its entirety to Plentywood, Inc., a Panamanian corporation, by means of a stock swap.[1] Through Parthenon, Plentywood would also appear to own one hundred percent of Constellation. All of Parthenon's capital, consisting of two contributions of $125,000 each, came from what McAdams has labeled Robert's "trust fund." Parthenon appears to have served as a type of self-insurance mechanism for BJMI. By corporate resolution, Parthenon granted BJMI the authority to "appoint such individuals as B.J. McAdams, Inc. deemed necessary to transact certain business matters of the corporation [Parthenon]." Parthenon had no salaried employees, instead relying on BJMI's clerical and administrative staff to perform its corporate tasks. There is no evidence that Parthenon ever compensated BJMI for the services. Throughout its corporate existence, Parthenon never maintained a bank account and conducted all of its transactions by cash or cashier's checks. McAdams agreed in his testimony before the bankruptcy court that he made "all decisions in regard to Parthenon on Robert's behalf."

The nature of the arrangements between BJMI and Parthenon were unusual in many respects. At the outset, BJMI paid Parthenon an insurance premium of $42,000 per month for $500,000 worth of coverage with a $50,000 deductible. All premiums paid prior to November 1987 were refunded to BJMI in full pursuant to a return premium agreement between BJMI and Parthenon. After November 1987, Parthenon refunded only fifty percent of the premiums, retaining the other half to "build up" its capital reserves. The retention appears to have been largely illusory, however, because Parthenon simply held BJMI's uncashed checks. Subsequently, Parthenon converted the uncashed premium checks to cashiers' checks and then loaned those funds back to BJMI through Constellation, an entity formally owned by Parthenon. The exact means by which the transfer from Parthenon to Constellation took place remains unclear. McAdams insisted in his testimony that the transfer was not a loan, but rather an investment governed by the terms of a murky document known as the "Matching Fund and Other Type Loan(s) and Security Agreement." Drafted by McAdams, the Matching Fund Agreement purported to govern secured loan transactions between BJMI and Constellation. In any event, McAdams's claim that we should rely on the Matching Fund Agreement to ascertain the terms of the transfers is undermined by the incoherence of the text of the Agreement, by the fact that McAdams drafted and signed the Agreement on behalf of both BJMI and Constellation, and by McAdams' continued assertion of an interest in Constellation's lien despite the fact that Plentywood now owns both Parthenon and Constellation.

---

1. McAdams testified that he traded one hundred percent of Parthenon and Constellation for ten shares, or roughly ten percent, of Plentywood in Robert's name. McAdams testified further that he had no knowledge of how much the ten shares were worth. We note that despite the purported sale of Parthenon to Plentywood, McAdams later agreed to sell Parthenon to yet a third party, though the deal eventually fell through.

In mid–1988, the monthly premium paid by BJMI to Parthenon was raised to $52,000, providing $1,000,000 of coverage with a $50,000 deductible. During the months of September through December of 1989, BJMI made no premium payments, instead executing promissory notes in favor of Parthenon. Consequently, Parthenon appears to have lacked the capital reserves to fulfill its responsibilities as an insurer. Evidence before the bankruptcy court indicated that Parthenon failed to pay at least two judgments against BJMI resulting from personal injury lawsuits.

### B.

A second corporation created by McAdams was B.J. McAdams Drivers Services, Inc. ("DSI"), an employee leasing entity which leased drivers to BJMI. The record indicates that McAdams was DSI's sole stockholder and that he located DSI in Indiana to take advantage of lower state worker's compensation insurance rates. When DSI was created, BJMI transferred all of its truck drivers to DSI as part of an arrangement to lease the drivers back to BJMI. DSI had no clients other than BJMI, no payroll department, no capital reserve, owned no real or personal property, and utilized BJMI's dispatcher and administrative staff. The Indiana office of DSI was staffed by two former BJMI employees who had transferred from BJMI's North Little Rock headquarters. When DSI eventually ceased doing business, all of its employees were returned to BJMI's payroll and control. At that time, DSI was significantly deficient on its withholding taxes owed to the Internal Revenue Service.

### C.

Central to this appeal is a third entity created by McAdams, Constellation Development Corporation. Incorporated in Delaware in mid–1988, Constellation was entirely owned by Parthenon. At the time Constellation obtained its asserted liens, Robert was the owner of Parthenon and, through it, Constellation. Constellation's sole director was Robert, who also served as president/secretary until March 1990. Constellation had no employees, no staff, no bank account, and no office, and all of its routine clerical functions were performed by BJMI employees. McAdams testified that Constellation was designed to serve as a vehicle to invest Robert's "trust fund," which he claimed to have established in Robert's childhood. No written documents evidencing such a trust were presented to the bankruptcy court. The trust corpus allegedly consisted of cash accumulated over the years by McAdams and placed in a lock box in BJMI's main terminal in North Little Rock. At McAdams' direction, $368,500 from Robert's "trust" was used initially to capitalize Constellation. The entire $368,500 was then loaned back to BJMI.

The loan arrangement was governed by the Matching Fund Agreement, a document drafted solely by McAdams. McAdams signed it on behalf of BJMI, and Robert signed on behalf of Constellation. McAdams testified that the terms were negotiated by him as the representative of both BJMI and Constellation. Pursuant to the Matching Fund Agreement, BJMI executed demand notes payable to Constellation at ten percent interest. To secure the amounts loaned from Constellation to BJMI, security agreements were executed granting Constellation a lien in various real and personal property of BJMI, including a 1977 Gates Learjet 36A. The parties stipulated below that all lien documents were properly recorded in accordance with the applicable state and federal laws. Those documents indicated that Constellation had a lien against the property of BJMI based on principal outstanding on the notes in the amount of $1,344,000, plus accrued interest. Of this amount, $428,000 was attributable to cash insurance premium payments made by BJMI to Parthenon and then loaned by Constellation to BJMI, and $208,000 was based on notes issued by BJMI to Constellation in lieu of making cash insurance premium payments to Parthenon. Of the remainder, Constellation asserts that $112,500 had been provided to it by BJMI to begin with, $368,000 was attributable to the cash used by McAdams to capitalize Constellation initially, and $227,000 was attributable to additional cash from Robert's "trust fund."

In an involuntary Chapter 7 petition brought against BJMI, the United States filed a proof of claim against the estate in the total amount of $1,110,089.34. The bankruptcy court approved the sale of BJMI's 1977 Gates Learjet for $1,562,050. The trustee commenced adversary proceedings for the determination of the validity, extent, and priority of liens asserted against the proceeds of the aircraft and other property of the estate by, among others, Constellation and the Internal Revenue Service. Constellation did not challenge the validity of the tax liens, but maintained that its lien was entitled to priority because it was filed before the tax liens. The IRS responded that Constellation's lien was invalid because the underlying debt was invalid.

Following an evidentiary hearing, the bankruptcy court found that Constellation's liens were void because Constellation was BJMI's alter ego. The district court affirmed.

## II.

Before we reach the merits, we must ascertain, first, whether the trustee in bankruptcy had standing to bring the action below, and second, whether the bankruptcy court had jurisdiction over the case.

■ First, characterizing the trustee's suit as an alter ego action, Constellation contends that *In re Ozark Restaurant Equip. Co., Inc.*, 816 F.2d 1222 (8th Cir.), *cert. denied sub nom. Jacoway v. Anderson*, 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987), deprives the trustee of standing to pursue this case in the first instance. In *Ozark*, this court held that the Bankruptcy Code did not give a Chapter 7 trustee standing to bring an action on behalf of the debtor corporation's creditors. Our analysis rested primarily on the Supreme Court's construction of the statutory provisions governing trustees in *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972), and on Congress's failure to override *Caplin* when it overhauled the bankruptcy laws in 1978. *Ozark*, 816 F.2d at 1228; *but see Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1347 n. 11 (7th Cir.1987), *cert. denied.* 485 U.S. 906, 108

S.Ct. 1077, 99 L.Ed.2d 237 (1988) (holding that failure of Congress to adopt bill overruling *Caplin* "does not affect a trustee's right to bring a general action on behalf of all creditors rather than a personal one on behalf of only some"). We concluded that "Congress's message is clear—*no* trustee, whether a reorganization trustee as in *Caplin* or a liquidation trustee ... has power under Section 544 of the Code to assert general causes of action, such as the alter ego claim, on behalf of the bankrupt estate's creditors." *Ozark*, 816 F.2d at 1228 (emphasis in original). In *Ozark*, the trustee initiated an adversary proceeding seeking to pierce the corporate veil in order to hold the debtor corporation's principals personally liable on the corporation's debts. *Ozark* held that while a trustee can pursue causes of action belonging to the debtor, only the creditors of the corporation can pursue a cause of action belonging exclusively to them. The conceptual rationale underlying *Ozark* has been summarized by the First Circuit: "The trustee steps into the shoes of the debtor for the purposes of asserting or maintaining the debtor's causes of action, which become property of the estate." *In re Rare Coin Galleries of America, Inc.*, 862 F.2d 896, 901 (1st Cir.1988). Looking to state law, *Ozark* held that an action by certain of a bankrupt corporation's creditors to impose personal liability on the principals for debts owed them by the corporation belongs to those creditors and cannot be maintained by the trustee. Put another way, *Ozark* stands for the proposition that a corporation cannot pierce its own veil.

■ The case before us is easily distinguishable from *Ozark*. We are not confronted with an alter ego action brought by the trustee in an effort to pierce BJMI's corporate veil and hold its principals personally liable on its debts. Rather, the trustee sought a judicial determination of the validity, extent, and priority of competing liens asserted against property of the bankrupt estate, including those of Constellation and the IRS. We find express authorization for such actions at 28 U.S.C. §§ 157(b)(1) and 157(b)(2)(K) and under Federal Rule of Bankruptcy Procedure 7001(2). In the pro-

ceeding below, the alter ego issue was raised by a competing creditor—the IRS—and not by the trustee. The IRS asserted the alter ego theory as a defense to the amended cross-claim filed against it by Constellation. As a competing creditor, the IRS occupies a very different position from the trustee. None of the statutory or prudential considerations confining the powers of trustees in *Ozark* and *Caplin* imposes a parallel limitation on the ability of a creditor to seek the invalidation of a competing lien. Accordingly, we find that the trustee had standing to bring the action below.

■■■■ Second, Constellation asserts that the bankruptcy court lacked jurisdiction over the trustee's action because the liens asserted against the aircraft exceeded its value. Constellation appears to suggest that because the proceeds of the airplane sale were insufficient to satisfy all of the liens asserted against it, the estate, in effect, had no property over which the court could exercise jurisdiction. This argument borders on the frivolous. An action to determine the validity, extent, or priority of liens asserted against the property of a bankrupt estate is a core proceeding under 28 U.S.C. §§ 157(b)(1) and 157(b)(2)(K). As the Seventh Circuit has stated, "resolving competing claims to property that belonged to the debtor when it filed a petition in bankruptcy is one of the central functions of bankruptcy law." *In re Xonics, Inc.*, 813 F.2d 127, 131 (7th Cir.1987). Here we need only ask whether the aircraft and its proceeds were property of the estate. Under 11 U.S.C. § 541(a)(1), the property of the estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case." *See, generally, United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203–05, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983); *Missouri v. Bankruptcy Court*, 647 F.2d 768, 774–75 (8th Cir.1981), *cert. denied*, 454 U.S. 1162, 102 S.Ct. 1035, 71 L.Ed.2d 318 (1982). In addition, 11 U.S.C. § 541(a)(6) makes clear that proceeds generated from the sale of property of the estate remain property of the estate.

■■■■ Because BJMI unquestionably held title to the aircraft at the commencement of the bankruptcy case, it follows that the pro-

ceeds from its sale were property of the estate. Bankruptcy court jurisdiction is not defeated where the aggregate amount of liens asserted by all parties exceeds the value of the property of the estate. Similarly, jurisdiction will not retroactively evaporate at the conclusion of a proceeding in which the bankruptcy court ascertains that the property of the estate is insufficient to satisfy all valid liens in full. Constellation's suggestion to the contrary betrays a profound misunderstanding of the basic concepts underlying federal jurisdiction. Here, the fact that the liens eventually found valid by the court exceeded the amount of the proceeds simply reflects the result of the court's exercise of jurisdiction; it does not mean that the court lacked jurisdiction at the outset.

We conclude that the district court's exercise of jurisdiction was proper.

### III.

■■■■ Turning to the merits of the appeal, Constellation asserts that the bankruptcy court made twenty-three errors in its findings of fact. Most of these asserted errors concern tangential facts that were the subject of conflicting testimony and documentary evidence; none appears to have any bearing on the ultimate disposition of the case. We echo the observation of an earlier panel in the *Ozark* saga: The appellants' argument "amounts to nothing more than an attempt to reargue facts decided by the bankruptcy court." *In re Ozark Restaurant Equip. Co., Inc.*, 850 F.2d 342, 346 (8th Cir.1988). Having carefully reviewed the record, we find no clear error in the bankruptcy court's findings of fact.

Moreover, we affirm the bankruptcy court's determination that Constellation constituted a mere alter ego of the debtor corporation. In view of the bankruptcy court's well-reasoned and thorough order, we need highlight only the most important of the facts dictating our conclusion. The heart of the issue is whether Constellation was so dominated by BMJI and McAdams that its corporate form must be disregarded and its lien be held void. "[A] bankruptcy court has full power to inquire into the validity of any claim

asserted against the estate and to disallow it if it is ascertained to be without lawful existence." *Pepper v. Litton*, 308 U.S. 295, 305, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939). "The conditions under which the corporate entity may be disregarded or looked upon as the alter ego of the principal stockholder vary according to the circumstances of each case." *Humphries v. Bray*, 271 Ark. 962, 611 S.W.2d 791, 793 (Ark.App.1981). Where a corporate form is challenged, "the real basis of liability is actual control and manipulation of the other, whether that control and manipulation be exercised by virtue of stock ownership or otherwise." *Henderson v. Rounds & Porter Lumber Co.,* 99 F.Supp. 376 (W.D.Ark.1951). The Arkansas Supreme Court has admonished:

> One of the surest indications of such abuse, however, is the fact that the executives of the subsidiary, instead of acting independently in its interests, take their orders from the parent corporation in the latter's interest.... [D]irectors cannot lawfully manage the affairs of one of the corporations in the interest of the other.

*Rounds & Porter Lumber Co. v. Burns,* 216 Ark. 288, 225 S.W.2d 1 (1949).

■ Under the alter ego doctrine, the legal fiction of the separate corporate entity may be rejected in the case of a corporation that (1) is controlled by another to the extent that it has independent existence in form only, and (2) is used as a subterfuge to defeat public convenience, to justify wrong, or to perpetuate a fraud. *Lakota Girl Scout Council, Inc. v. Havey Fund–Raising Management, Inc.,* 519 F.2d 634, 638 (8th Cir. 1975). "The essence of the [alter ego] test is whether, under all the circumstances, the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside." *Pepper,* 308 U.S. at 307, 60 S.Ct. at 245. A bankruptcy claim by an alter ego should be disallowed to prevent injustice.

We agree with the bankruptcy court's conclusion that Constellation's lien was not founded on any true debt. The financial transactions giving rise to Constellation's asserted lien bore none of the features of an arm's-length bargain. The record demonstrates that Parthenon owned Constellation, that Robert owned Parthenon, and that McAdams exercised total control over the business decisions of Robert. During the period relevant to this appeal, no one other than McAdams and Robert held an ownership interest in BJMI, Constellation, DSI or Parthenon. To simplify the chain somewhat, the record indicates that money flowed from BJMI to Parthenon, from Parthenon to Constellation, and from Constellation back to BJMI. More specifically, BJMI paid insurance premiums to Parthenon. At first, Parthenon refunded all of BJMI's payments. Later, Parthenon retained half of the premium, holding it in the form of uncashed checks. A portion of that money was eventually transferred to Constellation, which in turn loaned it to BJMI in exchange for a lien on the Learjet. Though purportedly an insurance company, Parthenon's only capital consisted of uncashed premium checks and liens in the property of its sole insured, BJMI. Constellation functioned only to make loans to BJMI in exchange for a security interest in the Learjet and other assets. As Constellation acknowledges, it needed no management or clerical staff because it simply loaned all of its funds to BJMI. McAdams alone negotiated, drafted, and signed the Matching Fund Agreement on behalf of both BJMI and Constellation—a curious arrangement in light of the fact that McAdams was neither an officer nor a director of Constellation, and owned no shares of its stock. As was the case in *In re Distrigas Corp.,* 75 B.R. 770, 773 (Bankr.D.Mass.1987), "[u]nless the left hand is independent of the right hand, there [was] no arms-length bargaining."

The evidence established that Constellation was controlled by BJMI, that it had independent existence in form only and that it was thus the mere instrumentality or alter ego of BJMI. As the bankruptcy court found, Constellation was incorporated at the behest of McAdams and, in reality, controlled by him. All of Constellation's funds were provided by McAdams pursuant to his instructions. Neither Constellation nor Parthenon had any reportable income. All their expenses appear to have been paid by BJMI. For example, the evidence showed that a

North Little Rock terminal property allegedly owned by Constellation was actually purchased with funds from BJMI without any corresponding from Constellation to BJMI. Likewise, McAdams testified that Constellation's litigation costs were funded out of Robert's "trust fund," even though Constellation now purports to be owned by Plentywood, the Panamanian entity.

In sum, we find that the evidence firmly establishes that McAdams attempted to shelter BJMI's assets from its creditors by means of a self-imposed lien. We agree with the conclusion of the bankruptcy court that "McAdams completely controlled the stock ownership, the officers, the directorships, the finances, the policies and practices, and every other corporate function without regard to any corporate formality." In such circumstances, it would have been inequitable to allow BJMI to deplete the estate by paying itself at the expense of its true creditors.

Accordingly, we affirm the order of the district court in its entirety.