SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

ALPINE MUTUAL FUND TRUST, an investment company consisting of two series funds, National Municipal Asset Trust and California Municipal Asset Trust, Defendant.

Civ. A. No. 91–F–2027.

United States District Court, D. Colorado.

May 12, 1993.

John J. Kelly, Jr., Virginia K. Schaeffer, and Edward A. Lewkowski, S.E.C., Denver, CO, for plaintiff.

Raymond L. Friedlob, Richard H. Goldberg, George D. Kreye, Brenman Raskin Friedlob & Tenenbaum, P.C., Denver, CO, for receiver.

Carla B. Minckley, Brega & Winters, P.C., Stuart N. Bennett, Stuart N. Bennett, P.C., Denver, CO, and David L. Chiras, and Glenn S. Schwartz, Fort Lauderdale, FL, for objector-creditors.

## ORDER REGARDING ADJUSTMENT OF NET ASSET VALUES: 1993–1

SHERMAN G. FINESILVER, Chief Judge.

This matter comes before the Court on the motion of the Receiver, Raymond L. Friedlob, for an order (1) authorizing the adjustment of the net asset value ("NAV") of the funds of the Alpine Mutual Fund Trust, (2) authorizing the Receiver not to pay interest on shareholder redemption claims and (3) requiring receivership expenses through December 31, 1992 to be prorated among all shareholders, including those being treated as creditors (the "Motion"). The Receiver also filed a supplement to the motion and an offer of proof of the anticipated testimony of Arthur Andersen & Co., S.C. Objections to the Motion were filed by 26 separate account holders as former shareholders of the California Municipal Asset Trust ("CMAT") (col-

lectively, the "Joint Objectors"[1]), and the Court acknowledged that letters of objection were filed individually by the following former CMAT shareholders: John F. Weaver and Barbara R. Weaver, Helen Kennedy Cahill and John E. Cahill, Trustees for the benefit of Helen Weber Kennedy Trust, and John E. Cahill and Helen K. Cahill, individually, Ethel F. Brant, Margaret A. Ryan, and a letter of objection filed by Blair Aaronson on behalf of Harry Grobe and Bertha Grobe, Trustees for the benefit of the Grobe Family Trust, a former shareholder of the National Municipal Asset Trust ("NMAT").

The Court held a hearing on the matters, made its rulings, and instructed the Receiver to file a proposed order embodying those rulings. We now expand on our bench rulings. Being fully advised in the premises, the Court hereby enters the following Findings of Fact and Conclusions of Law and Order:

## I. Findings of Fact

1. In or about June 1986, Defendant Alpine Mutual Fund Trust ("Alpine")[2] was organized as a Massachusetts business trust.

2. On or about September 19, 1986, Alpine registered with the Securities and Exchange Commission ("SEC") as an open-end investment company.

3. Alpine was the registrant for two different series mutual funds, CMAT and NMAT (collectively, the "Funds").

4. The primary investment objective of CMAT was to provide CMAT investors with dividend and interest income exempt from Federal and California income tax through investments in municipal obligations issued by the State of California or local government entities of that State.

5. The primary investment objective of NMAT was to provide NMAT investors Federally tax exempt income by investing in municipal obligations, primarily municipal leases and municipal bonds.

6. Edwin J. Pittock ("Pittock") was chairman of the board of trustees for, and president of, Alpine. Pittock was the president of Alpine Capital Management Corporation ("Alpine Capital"), the former investment adviser of NMAT from August 1989 to July 1991, and investment adviser to CMAT as of November 1991. Pittock was the principal shareholder of Alpine Holding Corporation, a co-owner of Alpine Capital, and of Alpine Broker Services Corporation, which was the distributor for shares of Alpine's series mutual funds, NMAT and CMAT. Pittock was also chairman, president, and substantial shareholder of Continental Heritage Management Investment, Inc., the company which served as investment adviser to Alpine's series mutual funds until about August 1989. Pittock was also a director and a principal shareholder of the series mutual funds' transfer agent and accounting services provider, Exchange Transfer Company. Pittock was also President of Alpine Municipal Leasing Corp., the municipal lease originator of leases purchased by the Funds.

7. On or about November 14, 1973, Alpine Capital registered with the SEC as an investment adviser.

8. On or about August 24, 1989, Alpine Capital became the adviser to Alpine's series mutual funds, including CMAT and NMAT, replacing Continental Heritage Management, Inc.

9. On or about July 28, 1991, Alpine Capital was replaced by H.L. Camp, a registered investment adviser with the SEC, as adviser to NMAT. Alpine Capital continued to serve as adviser to CMAT through November 20, 1991. Alpine Capital was owned by Alpine Holding Corporation, which was controlled

---

1. The Joint Objectors are: Arthur C. Bender and Bernice O. Bender; Leora A. Blackstone; Helen K. Cahill Living Trust; Helen K. Cahill and John E. Cahill, Trustees fbo Helen Weber Kennedy Trust; John Edward Cahill Living Trust; Bernice M. Dale; Eleanor B. Giorgi; John Green; Delores B. Johnson; Fred R. Jueneman/Family Trust; Fred R. Jueneman/Wife; William and Anna F. Keller; Jill Knisely; Malcolm B. Knisely; Carolyn Kroll; Ella M. Larson; Ella Larson/Trustee; Arlene P. Lincoln; Barbara C. Lincoln; Robert Linn; Alan C. Lisser; James D. Metcalfe; John Mortillaro and Mamie C. Mortillaro; Robert H. Pauls; Maiya Uruburu; and Amy Wheater. Collectively, the Joint Objectors held 240,457.215 shares in CMAT.

2. Originally, Alpine was known as Continental Heritage Mutual Fund Trust.

by Pittock and another principal shareholder, John I. Dickerson, who was chairman of Alpine Capital.

10. From about 1986 to in or about September 1991, NMAT offered for sale and sold securities in the form of shares to the general public through the use of its prospectus and statement of additional information filed with the SEC. The Fund's shares were sold by its distributor, Alpine Broker Services Corporation ("Alpine Broker"), a registered broker-dealer with the SEC.

11. From about 1986 to on or about November 20, 1991, CMAT, through its prospectus and statement of additional information filed with the SEC, sold shares to the general public. Fund shares were sold through its distributor, Alpine Broker.

12. The CMAT and NMAT prospectuses provided that the sale of their shares were made at the public offering price which was the net asset value plus the applicable sales commission, as described in the prospectuses. In general, the net asset value was determined by dividing the value of its assets (including interest accrued, but not collected), less its liabilities by the number of shares of the Fund outstanding. The prospectuses provided that the redemption price was the net asset value per share next determined after the request for redemption was received in good order by Exchange Transfer Company. Payment was to be made by the transfer agent within seven days of receipt of the redemption request.

13. Total assets were computed by determining the fair market value of each asset of the fund on a daily basis, generally each day the New York Stock Exchange was open for trading.

14. The prospectuses for CMAT and NMAT provided, in general, that in determining net asset value, each Fund would use market values when available and any not readily marketable security or asset would be valued at fair market value as determined by the Board of Trustees of the Fund.

3. Since August 16, 1991, NMAT, without approval required by the SEC, ceased making redemptions of its shares due to insufficient liquidity or cash with which to redeem its shares. On September 25, 1991, NMAT applied to the SEC to

15. The municipal leases held by CMAT and NMAT, which comprised a substantial portion of the portfolios of the Funds, generally were not readily marketable because of a lack of an organized secondary trading market. Municipal leases also included obligations issued by recognized Indian Tribal Governments, or their development authorities, to finance essential governmental functions or certain tribal-owned facilities located on tribal lands. The lack of a ready and orderly market for municipal leases made it difficult, especially for NMAT, to sell sufficient assets timely in order to obtain necessary cash to redeem the Funds' shares.

16. On or about November 20, 1991, the Court, at the request of the SEC and with the consent of Alpine through its president, Pittock, issued a Temporary Restraining Order ("TRO") enjoining disposition of any of the assets, and prohibiting the destruction of the books and records, of CMAT and NMAT until a receiver was appointed to manage the affairs of CMAT and NMAT. The factual basis for the TRO was that shareholders of NMAT, as of August 15, 1991, had been unable to redeem their shares and receive payment[3], and CMAT would likely be unable to honor redemption requests of its shares made prior to the TRO within the prescribed seven day period by section 22(e) of the Investment Company Act of 1940, 15 U.S.C. § 80a–22(e).

17. On or about November 25, 1991, the Court appointed Raymond L. Friedlob as equity Receiver of Alpine for CMAT and NMAT. The Receiver was empowered to administer and manage the business affairs and property of Alpine and CMAT and NMAT, take whatever actions were necessary, subject to approval of the Court, for the protection of shareholders of the Funds and their assets, and to liquidate the Funds' assets.

18. On or about December 12, 1991, the Court issued a Final Judgment of Permanent Injunction against Alpine.

approve continued suspension of redemption requests until October 31, 1991. On October 11, 1991, NMAT amended its application by requesting an extension to suspend redemption requests until January 2, 1992.

19. On or about May 12, 1992, the Receiver paid CMAT redeeming and remaining shareholders of record $.15 per share, and on or about November 18, 1992, the Receiver paid CMAT redeeming and remaining shareholders of record $.13 per share. Each payment was treated as a reduction of the claim for redeeming shareholders[4] and as a dividend on net investment income for remaining shareholders.

20. On or about June 19, 1992, the Court issued an Order establishing exclusive procedures for pre-receivership claims. Under the Order, shareholders of the Funds claiming as creditors were directed to provide the Receiver within 120 days of notice documentation supporting their claim.

21. Pursuant to the claims procedure, the Receiver prepared a list of all known or alleged claims which had accrued against Alpine prior to November 20, 1991, and which remained unpaid, and sent written notice to the potential claimants. All potential claimants were directed to provide to the Receiver documentation supporting their claim within 120 days of such notice and to state the amount of their claim. The claims procedure Order required the Receiver to approve or reject a claim within 90 days from receipt of a claimant's information regarding a claim. All approved claims, together with a proposed pay-out schedule, were to be submitted to the Court for approval for payment by the Receiver with notice to all approved claimants.

22. Pursuant to the claims procedure Order, the Receiver allowed the following claims from pre-receivership redeeming shareholders: For CMAT, 109 separate claims, which represented 493,626.519 shares valued at approximately $4,482,128.79 (utilizing, among other things, a pre-receivership published net asset value of $9.08 per share [from November 4–14, 1991] ); for NMAT, 29 separate claims, which represented 45,151.-605 shares valued at approximately $415,-846.28 (utilizing, among other things, a pre-receivership published net asset value of $9.21 per share [as of August 15, 1992] ).

23. Following appointment, the Receiver conducted an extensive investigation of the books and records of the Funds. As a result of that investigation, the Receiver determined that the most significant liabilities of the Funds represented shareholder redemption claims and that the pre-receivership published net asset values of the CMAT Fund since November 1, 1991 and of the NMAT Fund since August 15, 1991 were grossly inflated, materially inaccurate[5] and did not represent the fair market value of the Funds' assets.[6]

24. The Receiver conducted extensive evaluation of the Funds' assets and made further necessary adjustments to determine their fair market value by recommending to the Court their adjusted net asset values as of the date of the issuance of the TRO.

25. The Receiver determined, and recommended to the Court, the following adjusted net asset values for the Funds: For CMAT, $8.19 per share as of November 1, 1991[7], and

4. At the time each payment was made, the Receiver notified CMAT redeeming shareholders: "To the extent that you may later be determined to be a creditor of CMAT rather than a shareholder because you unsuccessfully attempted to redeem your shares (i.e., did not receive payment for their shares), this distribution will be considered to be part of the payment of your claim as a creditor." Letters of Rebekah Coe, Executive Director of CMAT, dated May 14, 1992 and November 18, 1992.

5. A discrepancy in excess of $.01 per share in the net asset value of a mutual fund is material, according to SEC policy governing companies regulated by the Investment Company Act of 1940.

6. The Receiver employed accepted methodology used to evaluate the fair market value of the Funds' nonmarketable municipal leases by considering, among other things, the performance of the leases; their collectibility; the value of the collateral securing the lease; and possible legal defenses to collection, such as the assertion of sovereign immunity, that might be available to a lessee Indian tribe. The Receiver was advised of the proper methodology for evaluating municipal leases by certified public accountants at Arthur Andersen & Co., S.C., which specializes in accounting and auditing for regulated investment companies, commonly known as mutual funds.

7. The SEC recommended that adjustments be made to the Funds' net asset values. The Receiver agreed with these adjustments as of November 1, 1991, which adjustments were similar in nature to those that would have been made for other SEC reporting companies filing a Form

for NMAT, $6.06 per share from August 15–16, 1991, $5.80 per share from August 19—September 26, 1991, $5.84 per share from September 27—October 22, 1991, and $5.87 per share from October 23—November 20, 1991.[8]

26. The Receiver, consistent with his obligation to preserve and protect the assets of the Funds, recommended those adjustments (¶ 25, *supra* ) as the Funds were required to pay to redeeming shareholders their net asset value based on fair market value, and not upon inflated or grossly inaccurate values. The Receiver further urged that if he paid redeeming shareholders at the pre-receivership published net asset values, they would receive consideration in excess of the Funds' fair market value, i.e., an undeserved windfall. Also, the Receiver sought to treat redeeming shareholders equitably with remaining shareholders by paying each class of shareholders fair market value for their equity interest in the Funds.

27. The Joint Objectors and other redeeming shareholders of the Funds opposed the Receiver's recommended net asset values of the Funds, adjusted as of the date of the issuance of the TRO, as they claimed that under the contract with the Funds they were entitled to be paid the pre-receivership published net asset values at the time their redemption requests were received by the Funds, and that their equity in the Funds should not be diminished by any accounting error or mismanagement of the Funds. The Joint Objectors stated that they have received confirmation of their redemption requests from CMAT, or its transfer agent, but acknowledged that none of them had actually been paid by the date of the issuance of the TRO. Other redeeming shareholders of the Funds may have received checks representing their redemption requests, but failed to undertake steps to collect on those checks prior to the issuance of the TRO.

28. The Receiver recommended that no interest be paid on shareholder redemption claims, which had been classified as creditor claims, as no interest had been paid to any vendor creditor and the Receiver does not contemplate paying interest to any remaining shareholders on their liquidating distributions. Also, payment of interest to redeeming shareholders/creditors would further dissipate the Funds' assets.

29. The redeeming shareholders contended that as creditors of the Funds, they are entitled to interest under § 5–12–102, C.R.S.

30. The Receiver recommended that pre-receivership redeeming shareholders share on a pro-rata basis with remaining shareholders in the expenses of the receivership from November 25, 1991 through December 31, 1992. During this period of time, the Receiver and his counsel have expended substantial time and effort (as more fully described in their prior interim applications for fees and costs) that have benefitted the redeeming and remaining classes of the Funds' shareholders. Among those benefits realized by the redeeming shareholders have been (i) securing good title to the Funds' assets; (ii) recovery of the Funds' assets improperly held by third-parties; (iii) proper identification of the redeeming shareholders; (iv) proper determination of the share balance in their accounts and (v) determination of the recommended pre-receivership adjusted net asset values of the Funds, which determination has included consulting with investment bankers specializing in the sale and valuation of municipal leases. The Receiver stated that a substantial portion of the receivership expenses paid, upon approval of the Court, from November 25, 1991 through December 31, 1992 were attributable to those benefits realized by the redeeming shareholders. The difficulty in realizing those benefits was compounded by the disarray of the Funds' books and records when the Receiver was

10–K (the Funds' fiscal year ended July 31, 1991). Also, the Receiver determined that there was no material change in the net asset value of CMAT from November 1, 1991 to November 20, 1991 and, thus, the adjusted net asset value attributed to November 1, 1991 was the functional equivalent to its net asset value on the operative date of November 20, 1991.

8. As NMAT suspended all shareholder redemptions on a regular basis after August 15, 1991, the Fund ceased operating and, thus, its pre-receivership value was fixed as of that date.

appointed and the poor accounting practices employed by the Funds in the management and operation of the Funds. The Receiver recommended the following further adjustments to the Funds' net asset values due to inaccurate reporting of the Funds' assets and liabilities as of the date of the issuance of the TRO: For CMAT, $.19 per share, and for NMAT, $1.51 per share.

31. The Joint Objectors opposed these further adjustments because they claimed that they were not benefitted by them, that is, the Receiver's efforts resulted in (i) augmenting the value of the Funds for purposes of liquidation, i.e., the remaining shareholders, and (ii) adversely affecting the net asset value payable to them (if the Receiver's recommended adjusted net asset value was approved by the Court).

32. The Court finds that the Receiver was qualified to undertake the duties of the receivership and to engage in activities that were necessary and reasonable to determine the net asset values of the Funds, based upon their fair market values, as of the date of the issuance of the TRO.

33. The Joint Objectors stipulated that the Receiver would testify as to those matters set forth in the Motion, the Supplement thereto and the Receiver's Memorandum (made a part of the Offer of Proof) regarding the methodology used to evaluate the municipal leases and other assets of the Funds and to arrive at the recommended net asset values of the Funds, as adjusted to the date of the issuance of the TRO, as more fully identified above (¶¶ 25, 30).

## II. Analysis

### A. Background Summary

The primary purpose of the motion is to establish the correct net asset value ("NAV") of each Fund in order to pay the claims of redeeming shareholders who requested redemption (the "shareholder redemption claims" or "SRCs") prior to the issuance of a temporary restraining order by this Court on November 20, 1991. The Receiver believes the proposed adjustments in the NAV are in the best interests of the shareholders and thus the Receivership estate.

Except as necessary for the preservation of Alpine's assets, the Receiver has paid none of the debts of Alpine that had accrued prior to his appointment. The Receiver has determined that shareholders who requested redemption prior to the issuance of the temporary restraining order should be treated as creditors of the Receivership estate rather than as shareholders of the Funds. The Receiver has approved certain of the SRCs for the creditors, but not as to amount.

The most significant liabilities of the Funds are represented by SRCs. The Receiver concluded that certain net asset values were being erroneously computed during the period of time critical to determining the amounts of the redemption claims. Therefore, the Receiver wishes to adjust the net asset values. The Receiver also wishes not to pay interest on the shareholder redemption claims and to require all receivership expenses through December 31, 1992 to be prorated among all shareholders, including creditors. The Joint Objectors point out that confirmation of their redemption claims was received by them prior to November 20, 1991, the date of the TRO. They challenge all three proposals by the Receiver.

### B. Retroactive Revision of the Net Asset Values

The Joint Objectors claim that a readjustment of the equities between groups of equally innocent victims of investment frauds has already been decided and rejected by the Tenth Circuit in *Johnson v. Studholme*, 619 F.Supp. 1347 (D.Colo.1985), *aff'd sub nom.*, *Johnson v. Hendricks*, 833 F.2d 908 (10th Cir.1987). The Receiver cites the same case for his claim that those shareholders holding SRCs should not be unjustly enriched at the expense of equally innocent investors who filed for no SRCs.

In *Studholme*, the receiver of a former Ponzi scheme perpetrator brought suit on behalf of the receivership to recover "fictitious profits," or payments already made to the early investors. The Court noted that all investors were innocent and all gave value, and after reviewing the case law concluded that no receiver of a defrauding entity has ever recovered payments to Ponzi scheme investors in excess of their contributions. *Id.*

at 1349. The Court stressed that it was hard to imagine a less deserving entity than the receiver of the defrauding entity, especially where it was not asserting the equitable considerations of investors. *Id.* at 1350. In dicta, the Court suggested that the fairness and appropriateness of redistributing "fictional profits" among the investors is unclear. *Id.* at 1350. The Court explained that some profitable investors may have spent the money already on "education or other necessities years ago" while some losing investors may have been merely speculators who were prepared to lose their investments. The Court's point was that there was "no neat answer to the various equities involved." *Id.*

There are distinctive features of *Studholme* not found here. First, the entity seeking redistribution here is not alleged to have been a defrauding entity; the equities are thus different. The second distinguishing characteristic is brought to light by the Joint Objectors' statement that the *Studholme* Court prohibited "readjustment of the equities." The statement raises the question of what the equities really are in this case. The Joint Objectors claim *Studholme* supports their argument that the paid investors should not be "divested of profits." We see no such profits. Indeed, what the Receiver is attempting to do is not to readjust the equities in the arbitrary manner that concerned the *Studholme* Court, but to make the equities *accurate.* The Joint Objectors are not being divested of anything they gained in the same legitimate way that other investors suffered losses, but rather, the paper profits initially accorded them have been seen to be erroneous and are being corrected.

This brings us to our third, related point: The *Studholme* Court explained that the problem, in that case, with readjusting investors' gains and losses lay both in the ambiguity of trying to sift through the equities (or worthiness) of investors in differing circumstances and in the practical impossibility of recouping gains already paid out and spent by their recipients. The Receiver, accordingly, agrees "there is no basis to recover any amounts paid to CMAT shareholders who redeemed and were paid prior to the TRO." Here, however, there is no attempt to redistribute what has been gained or lost based on mere chance or some arbitrary determination of just desert; instead, the Receiver is attempting to correct an accounting error to *equitably* reduce amounts that were incorrectly reported to the shareholders turned creditors as their proper redemption. Furthermore, the amounts have not yet been paid out. Therefore there is a "neat answer" to the equities involved.

Finally, there is some force to the Receiver's suggestion that he has the best interests of the remaining investors in mind. The Joint Objectors claim the Receiver has no standing to assert the claims of the remaining investors. They cite as authority *Caplin v. Marine Midland Grace Trust Co. of New York,* 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972) (holding bankruptcy has no standing to assert claims of debenture holders against indenture trustee); *Johnson v. Miller,* 596 F.Supp. 768, 772 (D.Colo.1984) (relying on *Caplin* to hold receiver has no standing to assert investors' claims of fraud where receiver was not harmed); *Johnson v. Chilcott,* 590 F.Supp. 204, 207–8 (D.Colo.1984) (relying on *Caplin* to hold receiver suing on behalf of defrauding entity with legal status separate from investors has no standing to assert investors' inducement to invest claims).

We first note that whether the Receiver has *standing* to assert investors' *claims* is a far different and more difficult question than whether the Receiver, and thus the Court, can consider the interests of the investors in its equitable decisions. We believe the Receiver can point out to the Court the way the equities fall upon the investors for whom the Receiver is acting, and the Court can consider such arguments in its decision.

But we note that *Caplin* is also distinguishable from the instant case. In *Caplin,* the Court took as its issue the bankruptcy trustee's arguments aimed at determining whether the bankruptcy trustee or the debt holders were in the best position to discover and prosecute claims based on the failure of the indenture trustee to live up to the provisions of the indenture. 406 U.S. at 427, 92 S.Ct. at 1684. The Court rejected the bank-

ruptcy trustee's arguments that it was in a superior position on several grounds, none applicable to this case: first, Congress had made comprehensive legislation in the area of indenture trustees and reorganization proceedings without mentioning that a bankruptcy trustee can sue third parties on behalf of debt holders. *Id.* at 428, 92 S.Ct. at 1685. There is no statutory scheme in this case which excludes by implication a receiver's accounting adjustments.

The Court also noted the case there involved a question of collecting money not owed to the bankruptcy estate but to debenture holders. The Court concluded with its second observation, that only the debenture holders had the power to make their claims against the indenture trustee on behalf of the reorganizing entity where the entity's contributory fault negated any abrogation rights. *Id.* at 429, 92 S.Ct. at 1685. In the instant case, the remaining investors are powerless to collect the money owed them and will receive no recognition of their rights without the Receiver's action.

The Court's third and fourth arguments against standing for the bankruptcy trustee included that any suits by the bankruptcy trustee might be inconsistent with independent actions by debenture holders, *id.* at 431–32, 92 S.Ct. at 1687, and any suits would also raise the question of who would be bound by settlement. *Id.* at 432, 92 S.Ct. at 1687. Here, the remaining investors could bring no suits inconsistent with the Receiver's attempted adjustment, particularly because it is unlikely they could bring a suit in the first place, much less prevail on recovering payments that, as in *Studholme,* have already been made. There is also no question of an inconsistent or inadequately binding settlement. For all of the reasons stated above, we believe the Receiver can, if necessary, assert the remaining investors' interests in his equitable arguments.

We therefore direct the Receiver to make the proposed adjustments in net asset value.

## C. Interest Paid on Shareholder Redemption Claims

■ The Receiver believes it would be unequitable to the remaining shareholders to pay interest to the SRC creditors. He ar-gues that paying interest to creditors would unfairly penalize the shareholders, who will not receive any interest accrued on their shares during the administration of the Receivership estate. Whether to allow interest on claims is in the Court's discretion. *Central Trust Co. of New York v. Denver & R.G.R. Co.,* 97 F. 239, 244 (C.C.A.Colo.1899).

The Joint Objectors respond by noting that creditors and shareholders are completely different types of obligees, and that creditors have priority over shareholders in the liquidation of a corporation. The Joint Objectors make three equitable arguments for granting them interest. First, they should not be penalized for their foresight in seeking to redeem their shares prior to the Receiver's appointment. Second, the Receivership has sufficient funds to pay the interest and has even made distributions already to both creditors and shareholders. Third, CMAT continues to earn income in the form of municipal lease payments, but the income accrues only for shareholders and not creditors. Therefore, the Joint Objectors argue, the shareholders are still getting some benefit for their shares and should not further be favored over the creditors.

We agree that creditors are superior in interest to shareholders and we also find the Joint Objectors' first and third arguments persuasive. We hold that the creditors should be paid interest accrued on their money between November 20, 1991 until payment.

In their objection to the Receiver's proposed order, the Joint Objectors assert they are entitled to interest accrued on the full amount of the outstanding net asset value. They object to the Receiver's proposal that interest be calculated on the NAV less the amount of the previously tendered payments of May and November 1992. They claim these payments were in the nature of dividends, and therefore should not reduce the principal on which the interest is based.

We reject the view that the payments were in the nature of dividends. First, the Joint Objectors have long regarded themselves as creditors, not shareholders (including their claim of a right to interest on their funds in

the first place), and are thus not equitably or legally entitled to dividends. The redeeming shareholders ceased being shareholders when their redemption requests were received by CMAT. The CMAT prospectus confirms that only CMAT shareholders are entitled to payment of dividends. Second, in the letters accompanying the payments, the Receiver clearly notified the redeeming shareholders that, to the extent they are later determined to be creditors of CMAT, the amounts paid to them would be considered a distribution in part payment of their claims as creditors.

We therefore find the payments were in the nature of partial distribution in satisfaction of the Joint Objectors' claims as creditors, and not dividends, and interest will be paid on the reduced amount. However, to the extent the Receiver has not paid the shareholders turned creditors interest that had accrued on the payments by the May and November 1992 distributions, the Receiver should do so.

### D. Payment of Receivership's Expenses

■ Again to prevent what the Receiver views as unjust enrichment of one group of investors at the expense of another, the Receiver proposes that the creditors share pro-rata in paying the receivership's expenses through December 31, 1992. The Receiver relies on a theory of unjust enrichment, pointing out that allowing creditors to avoid paying receivership expenses would grant them the benefit of the Receiver's efforts in "marshalling, preserving and enhancing the value of the Fund's assets" without having to pay for the Receiver services that brought them value. *See Cablevision of Breckenridge, Inc. v. Tannhauser Condominium Ass'n,* 649 P.2d 1093, 1097 (Colo.1982).

■ The Joint Objectors argue that some of the Receiver's work—for example, recalculating the NAV to the objectors' detriment—was not in the interest of the objectors. They cite an opinion of the Colorado Supreme Court which affirmed a district court's order directing the receiver not to pay accounting fees which were incurred for the benefit of the defendant, and not required for the dissolution of the corporation itself. *Van Schaack Holdings, Ltd. v. Fulenwider,* 768 P.2d 740, 743 (Colo.App.1988), *aff'd* 798 P.2d 424 (Colo.1990). However, in our view, whether the work of the Receiver has *always* benefitted the creditors is irrelevant where the creditors have received some benefit and where any detriment to them was caused only by the correction of improperly calculated gains. Furthermore, the Supreme Court's decision in *Van Schaack* is not on point: the Receiver's work was performed for the benefit of *all* concerned, regardless of the final result, and *was* required for the dissolution of Alpine Mutual's funds.

### III. Conclusions of Law

1. The Receiver was qualified to undertake the duties of the receivership and to engage in activities that were necessary and reasonable to determine the net asset value of the Funds, based upon fair market value, as of the date of the issuance of the TRO.

2. The redeeming shareholders of the Funds should be paid, in accordance with the prospectuses of the Funds, the net asset values, as recommended by the Receiver in ¶ 25 *supra,* that adjusts the fair market values of the Funds as of the date of the issuance of the TRO.

3. The requested payment by the redeeming shareholders at the pre-receivership published net asset values of the Funds to their redeeming shareholders would (i) result in a dissipation and wasting of the assets of the Funds, (ii) violate the charge and obligation of the Receiver to preserve and protect those assets and (iii) result in an undeserved windfall to the redeeming shareholders that was not within the contemplation of their arrangement with the Funds.

4. The redeeming shareholders are creditors of the Funds and are entitled to be paid interest in accordance with § 5–12–102, C.R.S.

5. The redeeming shareholders have benefitted from the Receiver's activities, as identified in ¶ 30 above, during the period from November 25, 1991 through December 31, 1992 and should pay their equitable share of the receivership expenses, as the Receiver has recommended.

6. The redeeming shareholders would be unjustly enriched if the Funds and their remaining shareholders bore the full cost of those activities of the Receiver. The allocation of the receivership expenses between the redeeming and remaining shareholders of the Funds is fair and equitable.

### IV. Order

Accordingly, it is ordered that:

1. The Receiver's recommendation to adjust the net asset value of CMAT to $8.19 per share, from November 1, 1991 to the date of the issuance of the TRO, is approved.

2. The Receiver's recommendation to adjust the net asset values of NMAT to $6.06 per share from August 15–16, 1991, to $5.80 from August 19—September 26, 1991, to $5.84 from September 27—October 22, 1991, and to $5.87 from October 23—November 20, 1991, is approved.

3. The redeeming shareholders of CMAT and NMAT shall be paid interest, as provided by § 5–12–102, C.R.S., as of the date of the issuance of the TRO until paid.

4. Each redeeming shareholder of CMAT shall be paid an adjusted net asset value of $8.19 per share, from November 1, 1991 to the date of the issuance of the TRO, less distributions of $.15 per share paid on May 12, 1992 and $.13 per share paid on November 18, 1992, together with interest on the unpaid balance of the adjusted NAV as well as any interest accrued on the May and November payments as of the date of their payment, as provided by § 5–12–102, C.R.S.

5. Each redeeming shareholder of NMAT shall be paid adjusted net asset values of $6.06 per share from August 15–16, 1991, $5.80 from August 19—September 26, 1991, $5.84 from September 27—October 22, 1991, and $5.87 from October 23—November 20, 1991, less distributions that may have been made to them after the date of redemption, together with interest as provided by § 5–12–102, C.R.S.

6. The Receiver's recommendation to prorate the receivership expenses during the period November 25, 1991 through December 31, 1992 between the redeeming and remaining shareholders of CMAT in the amount of

$.19 per share and between the redeeming and remaining shareholders of NMAT in the amount of $1.51 per share is approved. The prorated amounts shall be deducted from the Funds' adjusted net asset values identified in paragraphs 4 and 5 above, respectively.