Opinion issued July 27, 2006 
 

















In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-05-00665-CV
__________
 
HIGHLAND CAPITAL MANAGEMENT, L.P.; ML CBO IV (CAYMAN)
LTD.; PAMCO CAYMAN, LTD.; PAM CAPITAL FUNDING, L.P.; FAMCO
VALUE INCOME PARTNERS, L.P.; AND FAMCO OFFSHORE LTD.;
Appellants
 
V.
 
RYDER SCOTT COMPANY AND ROBERT A. HEFNER III, Appellees
 

 
 
On Appeal from the 151st District Court
Harris County, Texas
Trial Court Cause No. 2003-39194
 

 
 
O P I N I O N
          Appellants, Highland Capital Management, L.P.; ML CBO IV (Cayman) Ltd.;
Pamco Cayman, Ltd.; Pam Capital Funding, L.P.; Famco Value Income Partners,
L.P.; and Famco Offshore Ltd., challenge the trial court’s rendition of summary
judgments in favor of appellees, Ryder Scott Company (“Ryder Scott”) and Robert
A. Hefner III (“Hefner”), in appellants’ suit for negligent misrepresentation and fraud. 
In their first issue, appellants contend that the trial court erred in granting summary
judgments in favor of Ryder Scott and Hefner on grounds that appellants did not have
standing to pursue their claims. In their second issue, appellants contend that the trial
court erred in granting Ryder Scott’s motion to transfer venue. We affirm in part and
reverse and remand in part. 
Factual and Procedural Background
          In their second amended petition, appellants allege that in 1996 Seven Seas
Petroleum, Inc. (“Seven Seas”), an oil and gas company engaged in the exploration
and development of oil and gas properties in Colombia, operated and maintained a
significant working interest in the Guaduas Oil Field, located approximately 60 miles
northeast of Bogata, and, as such, assumed all responsibilities for the exploration,
development, and production from this field. 
          In January 1998, Seven Seas began trading on the American Stock Exchange,
requiring Seven Seas to report its reserve estimates, using the definition of “proved
reserves” provided in Rule 4-10(a) of Regulation S-X of the Securities Exchange Act
of 1934 in its filings with the United States Securities and Exchange Commission
(“SEC”).


 Seven Seas hired Ryder Scott, a reservoir-evaluation consulting firm, to
prepare reports on Seven Seas’ proved-reserve estimates. 
          Seven Seas, on March 31, 1998, filed its “Form 10-K,” which stated, based on
information incorporated from Ryder Scott’s proved-reserve estimate reports, that
Seven Seas’ proved-reserve estimates for the Guaduas Oil Field were 32.2 million
barrels, with a value of $144.9 million. Seven Seas filed similar 10-K forms on
March 31, 1999, March 30, 2000, and April 2, 2001, each reporting Seven Seas’ year-end proved-reserve estimates for the Guaduas Oil Field based on information
incorporated from Ryder Scott’s reports.


 In its April 16, 2002 Form 10-K, Seven
Seas reported proved-reserve estimates for the Guaduas Oil Field of 47.6 million
barrels, with a value of $272.3 million.
          In reliance upon the information contained in Seven Seas’ 10-K forms, which
incorporated figures from Ryder Scott’s reserve reports, appellants, between 1999 and
2002, purchased unsecured “subordinated notes,” or interests in such notes, issued by
Seven Seas to fund the expansion of its operations.


 The terms of these subordinated
notes allowed Seven Seas to subsequently issue senior “secured notes.” In order to
fund the drilling of a well and to finance its business operations, Seven Seas, in July
2001, issued an additional $45 million in secured notes.


 Chesapeake Energy
Corporation (“Chesapeake”) purchased one-half of these secured notes. A group of
investors, including Hefner, who was serving as Chairman and Chief Executive
Officer of Seven Seas, purchased the other one-half of these secured notes. Hefner 
personally purchased $15 million of the secured notes.
          On August 14, 2002, Seven Seas, based on Ryder Scott’s reserve report for the
period ending June 30, 2002, revised its proved reserves downward from its previous
reports to 16.3 million barrels. Because Seven Seas was no longer able to meet its
financial obligations, a group of unsecured creditors, including appellants, on
December 20, 2002, filed an involuntary petition for relief against Seven Seas under
Chapter 7 of the United States Bankruptcy Code


 in the United States Bankruptcy
Court for the Southern District of Texas, Houston Division (“Bankruptcy Court”). 
The case was converted into a Chapter 11


 case, and, on January 14, 2003, the
Bankruptcy Court appointed a trustee to represent the interests of Seven Seas’
creditors, equity holders, and other interest holders.
          The trustee filed a complaint, on March 31, 2003, in an adversary proceeding
in Bankruptcy Court against Seven Seas’ secured lenders, including Chesapeake, and,
on August 14, 2003, the trustee amended his complaint to include claims against
Seven Seas’ former officers and directors, including Hefner (hereinafter referred to
as the “D&O litigation”). The claims filed in this adversary proceeding related to the
issuance of the secured notes by Seven Seas, the trustee alleged Hefner breached
duties owed to Seven Seas and its creditors, and the trustee sought to effectively void
the security interests held by Chesapeake and Hefner and to recover damages, in part,
from Seven Seas’ directors and officer’s insurance carrier. On August 4, 2003, the
Bankruptcy Court entered an “Order Confirming Chapter 11 Trustee’s Second
Amended Plan of Reorganization for [Seven Seas].” The Confirmation Order
provided, in relevant part:
Injunction-Discharged Debts. The commencement or continuation of
any action, or the employment of process with respect to any debt
discharged hereunder, or an act to collect, recover or offset any debt
discharged hereunder other than in the manner provided in the Plan, as
a personal liability of the Debtor or property of the Estate be, and is
hereby, forever enjoined.
 
Additionally, as part of the plan of reorganization, Chesapeake entered into a
settlement with Seven Seas, and Seven Seas released its claims against Chesapeake. 
Hefner remained a defendant in the adversary proceedings in the Bankruptcy Court. 
Ryder Scott has never been named a defendant in the adversary proceedings in
Bankruptcy Court. 
          On January 27, 2003, a few weeks after Seven Seas entered bankruptcy,
appellants filed suit in Dallas County, Texas against Ryder Scott for negligent
misrepresentation. Ryder Scott then filed a motion to transfer venue to Harris
County, Texas, and, after the trial court granted the motion and transferred the case,
appellants filed a second amended petition, adding Chesapeake and Hefner as
defendants. In their second amended petition, appellants asserted against Ryder Scott
claims of negligent misrepresentation, fraud, aiding fraud under the Texas Securities
Act,


 and aiding and abetting fraud, and against Chesapeake and Hefner claims of
conspiracy to defraud and aiding and abetting fraud. Appellants alleged that in
preparing the reserve estimates incorporated into Seven Seas’ 10-K forms filed with
the SEC, Ryder Scott “had not faithfully applied the parameters set forth by the SEC
for the calculation of proved reserves.” More specifically, appellants alleged that
even though Ryder Scott reported that vast areas of the Guaduas field contained
proved reserves, “Ryder Scott knew these reserves had not been proved under the
SEC’s guidelines and Ryder Scott had no idea whether these reserves existed or could
ever be commercially developed.” Appellants further asserted that, under the relevant
business practices, Ryder Scott “knew or should have known that its proved-reserve
estimates for Seven Seas would be examined and relied upon” by appellants in
making their decisions to acquire or hold their investments in the subordinated notes.
          In support of its negligent misrepresentation claim, appellants asserted that
Ryder Scott owed them a duty to use reasonable care and competence in obtaining,
calculating, or communicating the proved-reserve estimates, that Ryder Scott
breached this duty, and that as a result appellants lost almost all of their investments
in the subordinated notes. In support of their fraud claim, appellants asserted that
they relied on Ryder Scott’s misrepresentations to their detriment and that Ryder
Scott knew that the information regarding Seven Seas’ proved-reserve estimates was
false or that Ryder Scott made the representations with reckless disregard. In support
of their Texas Securities Act claim, appellants asserted that Ryder Scott was liable as
an aider of fraud in the sale of the securities. In support of their conspiracy and
aiding and abetting claims, appellants asserted that Chesapeake, Hefner, and Seven
Seas entered into a common plan to defraud them by issuing and purchasing secured
notes “in order to decrease the assets available to investors in the [subordinated]
notes,” that they accomplished this fraud by employing the material
misrepresentations and omissions in Ryder Scott’s reserve reports, and that they used
those reports to induce appellants to purchase interests in the subordinated notes or
to refrain from selling their interests in the notes. Appellants further asserted that
Chesapeake and Hefner knew that Ryder Scott’s reserve estimates were false or were
made with reckless disregard.   
          Chesapeake removed appellants’ state court claims to the United States District
Court for the Southern District of Texas, and the removed claims against Chesapeake
were ultimately consolidated into an adversary proceeding in the Bankruptcy Court. 
 Chesapeake then filed a motion to dismiss the claims, arguing that appellants’ claims
against it had been released under the terms of the plan of reorganization previously
approved by the Bankruptcy Court.
          Ryder Scott and Hefner did not remove appellants’ state court claims against
them. Instead, on June 8, 2004, Hefner filed a summary judgment motion asserting
that appellants lacked standing to sue him because the trustee for Seven Seas had
exclusive standing to bring the claims being asserted by appellants. Hefner further
asserted that equitable principles underlying bankruptcy required that summary
judgment be granted so that the trustee could assert appellants’ claims in order to
ensure that all of Seven Seas’ creditors were treated equally. On July 15, 2004, Ryder
Scott filed its own summary judgment motion, stating that it was joining Hefner’s
motion and asserting that the grounds presented in Hefner’s motion applied equally
to it.
          On July 26, 2004, the trustee filed a complaint for injunctive relief in another
adversary proceeding in the Bankruptcy Court seeking to enjoin appellants from
prosecuting their state court claims against Hefner pending the outcome of the
trustee’s claims against Hefner and others in Bankruptcy Court. On August 6, 2004,
the Bankruptcy Court entered a preliminary injunction stating:
          (i)      the claims against Hefner in the State Court Action are
sufficiently related to the [Trustee’s] claims against Hefner
in Civil Action No. 03-5693 pending in the United States
District Court for the Southern District of Texas, Houston
Division . . . ;
 
          (ii)     the [Trustee’s] claims and the [state court claims] against
Hefner are claims to the same money, in the possession of
Hefner, as a result of the same acts; and
 
          (iii)    the [Trustee] should have the first opportunity to recover
on its claims against Hefner on behalf of all creditors of the
estate of [Seven Seas].
 
The Bankruptcy Court found that Seven Seas would be irreparably harmed if the
preliminary injunction was not issued “due to the possible reduction of funds”
available to Seven Seas and to the other parties if appellants were allowed to proceed
independently with their claims against Hefner. It also found that appellants would
not be harmed by the issuance of a preliminary injunction because, as creditors of the
estate of Seven Seas, they would benefit from any recovery obtained in the D&O
litigation. The Bankruptcy Court noted that it would “set a hearing on final
adjudication of who may proceed.” It then “preliminarily enjoined [appellants] from
further prosecution of their claims against Hefner in the State Court Action” and
stated that the preliminary injunction “shall remain in full force and effect until such
time as the [Bankruptcy] Court enters a Final Judgment in this adversary proceeding.”
          In the adversary proceeding concerning the removed claims against
Chesapeake, the Bankruptcy Court, on February 23, 2005, issued a final judgment
dismissing appellants’ claims against Chesapeake. The Bankruptcy Court also
entered a separate order, which applied in both adversary proceedings, denying
remand of the claims against Chesapeake and denying the modification of the
preliminary injunction that it had previously entered enjoining appellants from
prosecuting their claims against Hefner in the state court action. The Bankruptcy
Court issued a memorandum opinion


 in support of its final judgment and order. In
its memorandum opinion, the Bankruptcy Court summarized the procedural history
of the dispute as follows:
[A]bout three months after the confirmation of the chapter 11 plan,
Plaintiffs amended their petition in the State Court Lawsuit to add
Chesapeake and Hefner as defendants. The admended petition alleges
that Chesapeake and Hefner and the other directors conspired and
generally cooperated to inflate the reserve reports, thus overstating the
value of the company, thus allowing the issuance of Secured Notes, and
thus damaging Plaintiffs. The amended petition seeks damages for
securities fraud, fraud, conspiracy, and aiding and abetting fraud.
 
          When it was added as a defendant, Chesapeake removed the State
Court Lawsuit and filed a motion to enforce the order confirming the
chapter 11 plan, most prominent of which is the settlement and release
of Chesapeake. Subsequently, Chesapeake and Seven Seas filed an
adversary proceeding that seeks an injunction against Plaintiffs’ pursuit
of directors and the D&O coverage, asserting that those claims are
property of the estate, which are being pursued in the United States
District Court for the Southern District of Texas in case # 03-5693.
 
          Plaintiffs do not assert that they had any direct contact or
communications with Hefner, Chesapeake, or the other directors. 
Plaintiffs allegations of harm are that Chesapeake, Hefner, and the other
directors acted in concert to mislead investors in general about the value
of Seven Seas’ proven reserves by working in concert with Ryder Scott
to publish inflated reserve reports.



 
In determining that the claims against Chesapeake should be dismissed and that the
injunction as to Hefner should not be modified, the Bankruptcy Court summarized its
analysis as follows:
          In summary, whether a claim is property of the estate depends on
the nature of the injury and whether the debtor could have raised the
claim under state law as to the commencement of the case. If
Chesapeake and Hefner conspired to create claims with collateral rights
senior to other creditors, then the harm is generalized to all creditors. 
Not only “could have” the Debtor raised the claims against Chesapeake,
and Hefner, the Debtor did raise those claims. Therefore the claims
against Chesapeake and Hefner are property of the estate.
 
          Plaintiffs argue that they may pursue the claims because they have
rights under state law that are independent of the Debtor’s rights. That
argument misperceives the test. In virtually all of the Fifth Circuit cases
discussed above, both the debtor and a creditor had the ability to bring
an action. The extensive discussion by the Fifth Circuit assumes that
both have the right to bring the action. The decision that the state is the
proper party to bring the action is made by a reference to bankruptcy
principles, especially an avoidance of chaotic multiple actions in
multiple jurisdictions and a race to judgment and execution on the
judgment. Under the principles described above, the Debtor has the
right to bring that action; it is the property of the estate.



 
          Appellants timely filed a notice of appeal of the Bankruptcy Court’s judgment
and order, and the appeal is currently pending in the Southern District of Texas, the
same court where the D&O litigation against Hefner remains pending.
          Based on the Bankruptcy Court’s final judgment, order, and opinion, Hefner
supplemented his summary judgment motion and asserted that the opinion barred
appellants from pursuing their claims against him. Hefner contended that the
Bankruptcy Court stated “unequivocally that [appellants’] claims against Hefner are
property of the Bankruptcy Estate and cannot be pursued by [appellants] in this or any
other forum.” 
          Ryder Scott also filed a supplemental motion on the same basis, even though
the Bankruptcy Court expressly stated in its opinion:
ACTION AGAINST RYDER SCOTT WAS NOT REMOVED
 
It is the Court’s understanding that claims against Ryder Scott were not
removed. Therefore, this decision has no effect on any claim against
Ryder Scott that does not affect Chesapeake or Hefner.



 
          In separate orders, the trial court granted Ryder Scott’s supplemental summary
judgment motion and Hefner’s summary judgment motion without opinion.
 
Standing
          In their first issue, appellants argue that the trial court erred in granting
summary judgment in favor of appellees because (1) appellees failed to establish as
a matter of law that appellants lacked standing to pursue their claims against Ryder
Scott and Hefner; (2) the Bankruptcy Court opinion is inapplicable to appellants’
claims against Ryder Scott; and (3) Seven Seas’ bankruptcy filing did not exterminate
appellants’ “personal state law claims” against non-debtors or “assign appellants’
state law claims to Seven Seas.”
          Appellants assert that “it is axiomatic” that “as the parties that purchased and
held the notes in reliance on Ryder Scott’s false proved-reserve estimates,” they
would have standing to pursue Ryder Scott and Hefner, who they allege conspired to
misrepresent the proved reserves, for their damages caused in reliance on the
representations. Appellants further assert that their pleadings met every element for
standing under Texas law. In regard to the Bankruptcy Court opinion, appellants
emphasize that it is completely inapplicable to their claims against Ryder Scott
because their claims against Ryder Scott are not addressed in the plan and are not
being pursued by the trustee, and the Bankruptcy Court expressly stated that its
opinion did not apply to appellants’ state claims against Ryder Scott. 
          Ryder Scott and Hefner contend that appellants lack standing to pursue their
claims against them because appellants’ claims are based on general harm to all
creditors and, thus, are property of the Seven Seas’ bankruptcy estate and belong
exclusively to the trustee. Both Ryder Scott and Hefner rely heavily on the
Bankruptcy Court’s opinion dismissing appellants’ claims against Chesapeake and
denying the modification of its preliminary injunction as to appellants’ claims against
Hefner.


 Hefner also asserts that “[i]n a line of cases stretching over 20 years,” the
Fifth Circuit “has consistently held that claims of general harm to creditors—however
those claims may be characterized by individual plaintiffs—may be brought only by
the bankruptcy trustee.” See Pam Capital Funding, L.P. v. Nat’l Gypsum Co. (In re
Kevco), 309 B.R. 458 (Bankr. N.D. Tex. 2004), aff’d 113 Fed. App’x 29 (5th Cir.
2005); In re Schimmelpennick, 183 F.3d 347 (5th Cir. 1999); Schertz-Cibolo-Universal City Indep. Sch. Dist. v. Wright (In re Educators Group Health Trust), 25
F.3d 2181 (5th Cir. 1994); S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc. (In re
S.I. Acquisition), 817 F.2d 1142 (5th Cir. 1987); American Nat’l Bank v.
MortgageAmerica Corp., 714 F.2d 1266 (5th Cir. 1983). Ryder Scott cites these
cases as well, and asserts that appellants’ claims “are both derivative claims that
belong to Seven Seas’ bankruptcy estate, and claims asserting a generalized injury to
the bankruptcy estate that affects all creditors.”
          “The term ‘property of the estate’ includes ‘all legal or equitable interests of
the debtor in property as of the commencement of the case.’” In re Educators Group
Health Trust, 25 F.3d 1281, 1283 (5th Cir. 1994) (citing 11 U.S.C. § 541(a)(1)
(1988)). “All legal or equitable interests” includes causes of action. Id. A trustee has
exclusive standing to assert a cause of action belonging to the bankruptcy estate. See
Antonov v. Walters, 168 S.W.3d 901, 904–05 (Tex. App.—Fort Worth 2005, pet.
denied) (“Once a claim belongs to the bankruptcy estate, the bankruptcy trustee, as
the estate representative, has exclusive standing to assert the claim”). In determining
whether a cause of action is property of the estate, a court must consider whether
under state law the debtor could have asserted the action as of the commencement of
the case. See In re Educators Group Health Trust, 25 F.3d at 1284. In conducting
this inquiry, however, a court must also consider the nature of the injury alleged, i.e.,
whether the injury to the plaintiff is a direct or a derivative harm. Id. As the Fifth
Circuit has explained:
If a cause of action alleges only indirect harm to a creditor (i.e., an injury
which derives from harm to the debtor), and the debtor could have raised
a claim for its direct injury under the applicable law, then the cause of
action belongs to the estate. Conversely, if the cause of action does not
explicitly or implicitly allege harm to the debtor, then the cause of action
could not have been asserted by the debtor as of the commencement of
the case, and thus is not property of the estate.
 
Id. (internal citations omitted).
          With respect to claims asserted against directors and officers of a corporation,
including Hefner, the Bankruptcy Court recited in its opinion:
The estate created pursuant to section 541 succeeds to any right of
action the debtor corporation may have to recover damages for
misconduct, mismanagement, or neglect of duty by a corporate officer
or director. Thus, it has been held that the trustee may prosecute a
cause of action based on the fraud of the officers, directors, or
shareholders for fiduciary misconduct, unlawful diversion of assets, or
upon a statutory liability created by the law of the state of
incorporation.
 
Memorandum Opinion at *4–5 (citing Collier on Bankruptcy, 15th ed., 
§ 541.08[5]).
          Here, the trustee brought suit against Hefner in Bankruptcy Court related to
Seven Seas’ issuance and Hefner’s subsequent purchase of the secured notes. The
trustee alleged Hefner breached duties owed to Seven Seas and its creditors, including
appellants, and, as a result of Hefner’s breach of these duties, the trustee sought “to
avoid [Hefner’s] security interests,” “to obtain a judgment against . . . Hefner for
damages,” and to recover damages from “its directors and its Directors and Officer’s
Insurance Carrier.” Similarly, in the state court lawsuit, appellants asserted that
Hefner committed the torts of conspiracy and aiding and abetting by entering into a
common plan to defraud them by issuing and purchasing secured notes in order to
decrease assets available to the holders of the subordinated notes. We conclude that
the nature of the injury for which relief is sought against Hefner in state court, which
can be described as the depletion of Seven Seas’ assets to the detriment of appellants,
as well as all other creditors of Seven Seas, is derivative of Seven Seas’ direct injury. 
          Our conclusion is supported by the fact that the trustee in Bankruptcy Court is
effectively seeking, as a remedy for Hefner’s alleged breach of his duties to Seven
Seas and its creditors, to void the security interests held by Hefner, which appellants
allege in their state court lawsuit that Hefner created as part of his common plan to
defraud them. If the trustee is successful in his claims against Hefner in Bankruptcy
Court, Hefner’s interests in any secured distribution from Seven Seas’ bankruptcy
estate would be effectively voided. See MortgageAmerica, 714 F.2d at 1275 (holding
that action under the Uniform Fraudulent Transfers Act belongs to estate because
debtor was stripped of assets, causing derivative injury to plaintiff creditor). As
succinctly noted by the Bankruptcy Court, “If . . . Hefner conspired to create claims
with collateral rights senior to other creditors, the harm is generalized to all creditors. 
Not only ‘could have’ [Seven Seas] raised the claims against . . . Hefner [in state
court], [Seven Seas] did raise those claims.” Memorandum Opinion at *8. In accord
with the Bankruptcy Court’s opinion, and with the principles set forth by the Fifth
Circuit in In re Educators Group Health Trust, 25 F.3d at 1284, we conclude that the
claims asserted by appellants in state court against Hefner are the property of Seven
Seas’ bankruptcy estate. Accordingly, we hold that the trial court did not err in
granting summary judgment in favor of Hefner. 
          However, the summary judgment granted in favor of Ryder Scott presents a
different issue. First, we note that the Bankruptcy Court expressly stated in its
opinion that its decision had no effect on any claim against Ryder Scott. 
Memorandum Opinion at *12. Second, appellants’ claims against Ryder Scott cannot
be characterized as “property of the estate” because Seven Seas could not have
asserted these claims at the commencement of its bankruptcy. See In re Educators
Group Health Trust, 25 F.3d at 1284. For example, appellants’ misrepresentation and
fraud claims against Ryder Scott are based on appellants’ reliance on Ryder Scott’s 
representations concerning Seven Seas’ proved-reserve estimates and on appellants’
damages, i.e. their loss of their investments in the subordinated notes based on their
reliance. These claims against Ryder Scott are based on a direct harm to appellants,
not a derivative harm to Seven Seas. For example, in In re Educators Group Health
Trust, the Fifth Circuit, finding that the plaintiff’s negligent misrepresentation and
fraud claims belonged solely to the plaintiffs, noted: 
          We do agree, however, with the plaintiff school districts’
contention that some of the causes of action allege a direct injury to
themselves, which is not derivative of any harm to the debtor. For
example, the plaintiff school districts allege in . . . the complaint that
the defendants intentionally misrepresented to them the financial
situation of EGHT, and that they materially relied on such
representations to their detriment. To the extent that this cause of
action and others allege a direct injury to the plaintiff school districts,
they belong to the plaintiff school districts and not the estate.
 
25 F.3d at 1284.
          Similarly, appellants’ Texas Securities Act claim arises from appellants’
purchase of securities. See Tex. Rev. Civ. Stat. Ann. art. 581.33-A(2), C(2), D(1),
and F(2) (Vernon Supp. 2005). Here, the parties agree that Seven Seas could not
pursue the same remedies under this Act. 
          The causes of action asserted by appellants against Ryder Scott are similar to
those asserted by the plaintiff in Caplin v. Marine Midland Grace Trust Co. of New
York, which were determined not to be “property of the estate.” 406 U.S. 416, 92 S.
Ct. 1678 (1972). In Caplin, the Supreme Court held that a bankruptcy trustee did not
have standing to bring claims against an indenture trustee on behalf of debenture
holders. Id. at 434, 92 S. Ct. at 1688. The debtor in Caplin issued debentures,
pledged to limit its debt-equity ratio, and, in order to demonstrate continuing
compliance with this pledge and other requirements of the indentures, agreed to file
an annual certificate of compliance with an indenture trustee. Id. at 417–18, 92 S. Ct.
at 1680. When the debtor entered bankruptcy, the bankruptcy trustee conducted an
investigation that revealed that the indenture trustee may have “either wilfully or
negligently failed to fulfill its obligations under the indenture” because the debtors’
certificates of compliance were fraudulent and based on grossly overvalued appraisals
of the debtor’s property. Id. at 419, 92 S. Ct. at 1681. The bankruptcy trustee alleged
that the indenture trustee should have known or did know about the inflated appraisal
and filed suit against the indenture trustee on behalf of the debenture holders, 
“seeking to recover the principal amount of the outstanding debentures as damages
for [the indenture trustee’s] alleged bad-faith failure to compel compliance with the
terms of the indenture.” Id. at 420, 92 S. Ct. at 1681. The Supreme Court, holding
that the bankruptcy trustee lacked standing to bring the action on behalf of the
debenture holders, stated that “nowhere in the statutory scheme is there any
suggestion that the [bankruptcy] trustee is to assume the responsibility of suing third
parties on behalf of debenture holders” and “there is nothing in the section that
enables [the bankruptcy trustee] to collect money not owed to the estate.” Id. 
          Likewise, here, we conclude that the trustee in the Bankruptcy Court would not
have standing to pursue claims against Ryder Scott. Not surprisingly, no such claims
have been made in the bankruptcy proceedings by the trustee. The fact that appellants
represent a large number of creditors who purchased subordinated notes based on
alleged misrepresentations made by Ryder Scott does not convert appellants’ personal
state law claims into claims that belong to or are property of the bankruptcy estate. 
See In re Educators Group Health Trust, 25 F.3d at 1285 n.4 (stating that it has
“neither held nor implied that a cause of action belongs to the estate simply because
it could be brought by many creditors, as opposed to only one”).


 Accordingly, we
hold that the trial court erred in granting summary judgment in favor of Ryder Scott.
          We overrule appellants’ first issue in regard to Hefner, and sustain appellants’
first issue in regard to Ryder Scott.
Venue
          In their second issue, appellants argue that the trial court erred in granting
Ryder Scott’s motion to transfer venue. In their original petition, appellants asserted
that venue was proper in Dallas County because all or a substantial part of the events
giving rise to their claims occurred in Dallas County. Ryder Scott filed a motion to
transfer venue, objecting to venue in Dallas County. Ryder Scott denied that Dallas
County is where all or a substantial part of the events or omissions occurred and
sought to transfer venue to Harris County on the ground that “Harris County is the
county in which all or a substantial part of the events or omissions giving rise to
[appellants’] alleged claims occurred and/or because Harris County is where Ryder
Scott maintains a ‘principal office.’” 
          Appellants filed a response to Ryder Scott’s motion, and attached the affidavit
of Kurt Plumer. In his affidavit, Plumer testified that he was the portfolio manager
of appellant Highland Capital, that his responsibilities included researching,
analyzing, evaluating, and making recommendations regarding potential investments,
that the other plaintiffs in the lawsuit were funds managed by Highland Capital, and
that he was the person principally responsible for evaluating the financial information
related to the acquisition of the senior subordinated notes issued by Seven Seas. As
part of his research, Plumer examined the 10-K forms filed by Seven Seas with the
SEC for year ends of 2000 and 2001. These 10-K forms included estimated net
proved oil reserves based upon reports prepared by Ryder Scott, and the 10-K form
for year end 2001 contained a provision stating that Ryder Scott consented to the
incorporation of its reserve report in the 10-K form. The 10-K forms for 2000 and
2001 reference the senior subordinated notes. Plumer stated that in reliance upon
Ryder Scott’s estimates, he determined that it was “feasible” to acquire interests in
the subordinated notes, that he made a recommendation in support of this acquisition
to Highland Capital in accordance with this determination, and that the credit
committee approved this recommendation and acquired the subordinated notes. 
          In regard to Dallas County, Plumer testified:
          All of the information I received regarding Ryder Scott’s
estimates of Seven Seas’ net proved oil reserves, I received at my
Highland Capital office which is located in Dallas County, Texas. All
of the reliance that I placed upon Ryder Scott’s estimates of Seven
Seas’ net proved oil reserves in making my recommendation . . .
occurred in Dallas County, Texas.
 
          All of the information which was received by the Capital
Committee at Highland Capital regarding Ryder Scott’s estimates . . .
was received by the Capital Committee at the offices of Highland
Capital in Dallas County, Texas. All of the reliance that was placed
upon Ryder Scott’s estimates of Seven Seas’ net proved oil reserves in
making its decision to make investments . . . occurred in Dallas County,
Texas. Furthermore, the decision to make the investment in the . . .
senior subordinated notes that are involved in this lawsuit was also
made in Dallas County, Texas. Additionally, all of the information
received regarding Ryder Scott’s estimates . . . and all reliance thereon
in making decisions to refrain from selling the acquired interests . . .
occurred in Dallas County, Texas.
 
          Ryder Scott also filed evidence in support of its motion to transfer venue. 
Ryder Scott attached the affidavit of Thomas L. Gardner, vice president of Ryder
Scott, in which Gardner testified that between 1997 and 2002, Ryder Scott prepared
estimates and reports for Seven Seas. The reports were prepared for the exclusive use
of Seven Seas, and at Seven Seas’ request, which was made in Harris County, Ryder
Scott agreed to allow Seven Seas to include Ryder Scott’s estimated proved reserves
in Seven Seas’ 10-K forms filed with the SEC for year ends 2000 and 2001. Gardner
also testified that Ryder Scott’s principal place of business is Harris County and that
all of the work Ryder Scott performed for Seven Seas that is the basis of this lawsuit
“was done exclusively in Harris County.” Gardner explained:
          Ryder Scott reviewed and analyzed Seven Seas’ production data
in Harris County, Texas; Ryder Scott met with and interviewed Seven
Seas’ employees in Harris County, Texas; Ryder Scott prepared its
estimates and reports in Harris County, Texas; and Ryder Scott
delivered its reports to Seven Seas in Harris County, Texas.
 
          In addition, all of Ryder Scott’s communication with Seven Seas
regarding Ryder Scott’s work occurred in Harris County, Texas,
including Seven Seas’ request for permission to include Ryder Scott’s
estimated proved reserves . . . in the Form 10-K that Seven Seas filed
with the [SEC] . . . and Ryder Scott’s consent to Seven Seas’ requests. 
No aspect of Ryder Scott’s work for Seven Seas was performed in
Dallas County, Texas.
 
          Ryder Scott has no contact or communications with Plaintiffs in
Dallas County, Texas and prior to the filing of this lawsuit, was
completely unaware of the existence or identity of the Plaintiffs and of
their transactions involving Seven Seas’ . . . unsecured notes.
 
The Dallas County district court granted Ryder Scott’s motion without opinion, and
transferred the case to Harris County. After the transfer, appellants added Hefner as
a defendant.
          “Plaintiffs are accorded the right to choose venue first.” Chiriboga v. State
Farm Mut. Auto. Ins. Co., 96 S.W.3d 673, 677 (Tex. App.—Austin 2003, no pet.). 
When a defendant challenges the plaintiff’s choice of venue, the plaintiff has the
burden to present prima facie proof that venue is maintainable in the county of suit.
Tex. R. Civ. P. 87(2)(a), (3)(a); Chiriboga, 96 S.W.3d at 678. If the county chosen
by plaintiffs in a lawsuit was a county of proper venue, then a county to which a suit
is transferred “cannot be a county of proper venue as a matter of law.” Wilson v. Tex.
Parks & Wildlife Dep’t, 886 S.W.2d 259, 261–62 (Tex. 1994); Jaska v. Texas Dep’t
of Protective and Regulatory Servs., 106 S.W.3d 907, 910 (Tex. App.—Dallas 2003,
no pet.). Affirming a trial court’s granting of a motion to transfer venue, when the
original county the plaintiff selected had been a county of proper venue, would
“eviscerate the plaintiff’s right to select venue.” Wilson, 886 S.W.2d at 261. Thus,
we conduct a de novo review of the trial court’s granting of the motion to transfer
venue, and we must look to determine whether there is any probative evidence that
venue would have been proper in Dallas County. See id. If so, it was reversible error
for the Dallas County court to have transferred venue to Harris County. Jaska, 106
S.W.3d 907
          The parties agree that the general permissive venue statute is applicable here.
See Tex. Civ. Prac. & Rem. Code Ann. § 15.002 (Vernon 2002). Section
15.002(a)(1) provides that venue is permissive in the county where “all or a
substantial part of the events or omissions giving rise to the claim occurred.” Id. In
this case, we must determine whether there is any probative evidence that “all or a
substantial part of” the events giving rise to this lawsuit” occurred in Dallas County,
and thus appellants’ choice of venue in Dallas County was proper.
          In addressing the scope of the current venue statute, which provides for proper
venue in counties where “all or a substantial part of the events or omissions giving
rise to the claim occurred,” we note that the predecessor venue statute provided for
venue “in the county in which all or part of the cause of action accrued or in the
county of defendant’s residence . . . . ” Act of May 18, 1995, 74th Leg., R.S., ch. 138,
§ 1, 1995 Tex. Gen. Laws 978 (amended 1995) (current version at Tex. Civ. Prac.
& Rem. Code Ann. § 15.002(a)(1) (Vernon 2002)). The amended venue statute
“narrowed the number of counties in which venue could be maintained to those with
a substantial connection to the lawsuit.” Chiriboga, 96 S.W.3d at 681. Under the
predecessor statute, a plaintiff could maintain venue in a county where any part of a
cause of action accrued, “no matter how unimportant the connection might be.” Id. 
The amended statute “requires that the basis for venue be a ‘substantial part’ of the
cause of action at issue.” Id. Although we should not attempt to choose the “best
venue” when conducting our de novo review, we must determine whether the
substantiality threshold provided in section 15.002(a)(1) has been satisfied. See id.
          Here, the only “event” cited by appellants is that their portfolio manager
“received” and reviewed Seven Seas’ 10-K forms, which apparently were filed with
the SEC and were available to the public, in Dallas County, Texas. However,
appellants do not explain how he “received” the 10-K forms, which indisputably were
not even filed by Ryder Scott, and there is no allegation that Ryder Scott directed the
SEC forms to appellants or to Dallas County. Although appellants assert that Ryder
Scott’s reports were incorporated into these 10-K forms, there is no allegation that
appellants met with or spoke with anyone from Ryder Scott or even Seven Seas in
Dallas County, or that Ryder Scott or Seven Seas directed the 10-K forms to
appellants in Dallas County. The evidence presented by Ryder Scott, which is
undisputed, is that all of the work performed by Ryder Scott for Seven Seas that is the
basis of this lawsuit, including the reviewing and analyzing of Seven Seas’
production data, the interviewing of Seven Seas’ employees, and the preparing of its
reports, occurred in Harris County, Texas. Appellants’ suit, according to appellants’
own petition, is based on Ryder Scott’s failure to follow the parameters set forth by
the SEC in calculating the proved-reserve estimates incorporated by Seven Seas into
its 10-K forms filed with the SEC. This evidence supports an implied finding by the
Dallas County district court that there was no probative evidence that “all or a
substantial part of” the events giving rise to this lawsuit occurred in Dallas County.
Accordingly, we hold that the Dallas County district court did not err in transferring
the case to Harris County. 
          We find the primary case cited by appellants to be distinguishable. In Hyman
Farm Serv. Inc. v. Earth Oil & Gas Co., 920 S.W.2d 452, 456 (Tex. App.—Amarillo
1996, no pet.), the court stated that in a fraud claim, “venue may be sustained in the
county where the words are heard by the person defrauded.” However, Hyman was
decided under the predecessor version of the permissive venue statute and, more
significantly, the case was centered on the allegation that a seller directly made
misrepresentations to a buyer during a phone conversation. Id. The court held that
venue was proper in the county in which the buyer was located during the
conversation. Id. In this case, the allegations are focused on misrepresentations
contained in SEC documents that were filed by Seven Seas, not Ryder Scott, based
on information incorporated from reports prepared by Ryder Scott in Harris County.
There is no evidence that Ryder Scott directly contacted appellants in Dallas County
or that Ryder Scott was even aware that its reports would be relied upon in Dallas
County. 
          We overrule appellants’ second issue.
 
 
 
 
 
Conclusion
          We affirm in part and reverse and remand in part for proceedings consistent
with this opinion. 
 
 
                                                                        Terry Jennings
                                                                        Justice

Panel consists of Justices Jennings, Hanks, and Higley.